BEMIS COMPANY, INC. and Wabash Products, Division of Bemis Company Co., Inc., Defendants-Appellants,

v.

Gerald G. RUBUSH and Phyllis C. Rubush, Plaintiffs-Appellees.

No. 1–877A164.

Court of Appeals of Indiana, First District.

March 4, 1980.

Rehearing Denied April 16, 1980.

---

Arthur P. Kalleres, David L. Gray, Ice Miller Donadio & Ryan, Indianapolis, C. Thomas Cone, Williams, Cone & Billings, Greenfield, for defendants-appellants.

Howard J. DeTrude, Jr., Peter G. Tamulonis, Kightlinger Young Gray & DeTrude, C. Warren Holland, John M. Choplin, II, James L. Brand, Wilson, Tabor & Holland, Indianapolis, for plaintiffs-appellees.

NEAL, Judge.

On October 19, 1971, Gerald G. Rubush (Gary) was working as a bagger on a fiberglass insulation batt packing machine for Johns-Manville Corporation. The batt packing machine was designed by Bemis Company, Inc. and Wabash Products, Division of Bemis Co., Inc. (both hereinafter referred to as Bemis). While performing his work as a bagger on the batt packer, and in the course of the batt packer's operation, Gary was struck in the head by a moving part of the machine. This moving part was called a shroud, and it was a visible moving part of the batt packing machine. The blow to the head caused Gary to suffer serious injuries to his skull and brain.

As a result of the injury, Gary and his wife, Phyllis C. Rubush (Phyllis), filed suit against Bemis for personal injuries sustained by Gary, and for loss of services sustained by Phyllis, on a theory of strict liability in tort under § 402A of the Restatement (Second) of Torts (1965). The jury returned a verdict for Gary for $750,-000 and for Phyllis for $25,000, and thereafter, the trial court entered judgment on the verdict. Bemis then filed a timely motion to correct errors, which was denied. This appeal results.

We affirm in part and reverse in part.

In its motion to correct errors, Bemis presents the following issues for our review:

I. Whether the trial court erred when it precluded Bemis from ascertaining during voir dire whether prospective jurors would follow a rule of strict liability that a manufacturer is not liable for injuries that result from open and obvious dangers.

II. Whether the trial court erred when it stated before the jury that a manufacturer cannot, as a matter of law, evade liability in strict liability for injuries caused by open and obvious dangers in product design.

A. Whether the trial court erred in refusing Bemis' Tendered Instructions Nos. 4 and 5, stating that the Indiana rule of strict liability precludes liability when the danger is open and obvious.

B. Whether the trial court erred by giving its Instructions Nos. 7 and 8 which instructed the jury that the open and obvious nature of the danger was not a defense in strict liability and that Bemis could be found liable in strict liability even though the danger was open and obvious.

III. Whether the instructions to the jury, considered as a whole, fairly and adequately instructed the jury on the applicable law without substantial prejudice to Bemis, particularly:

A. Whether the trial court erred in refusing to define "unreasonably dangerous" under the strict liability theory pursuant to Bemis' Tendered Instruction No. 3, or by so instructing the jury *sua sponte* as required by Ind. Rules of Procedure, Trial Rule 51(B).

B. Whether the trial court erred by giving its Instruction No. 10 which stated that Bemis would be liable for failure to warn of any design danger, and not merely those which would be "unreasonable" in the absence of a warning.

C. Whether the trial court erred in giving Instruction No. 8 which assumed that it was proper for Gary to be in the path of the batt packer's moving part which injured him when, in fact, such issue was contested, and, allegedly, an issue for the jury.

D. Whether the trial court erred by giving its Instruction No. 14 which stated that to find for Bemis, the batt packer must have been found to be

neither defective nor unreasonably dangerous at the time of the accident.

E. Whether the trial court erred in refusing to give Bemis' Tendered Instruction No. 7 which stated that Bemis could prevail despite a finding that the batt packer was "defective and unreasonably dangerous" if there was some intervening cause in the causal chain of events leading up to Gary's injury.

F. Whether the trial court erred in giving its Instruction No. 12 which stated that Gary's voluntary encounter with a known danger would not be a defense where the ordinarily prudent person would take the risk if ordered to do so by his employer.

IV. Whether the trial court erred in its rulings on evidentiary matters, or whether such rulings were within the court's discretion and were consistent with substantial justice, specifically:

A. Whether the trial court erred by refusing to allow the impeachment of one Gary Mackey, either by prior inconsistent statements or by contradicting his in-court statements, and by refusing to allow the impeachment of one Virgil Mahoney by use of prior inconsistent statements.

B. Whether the trial court erred in allowing Virgil Mahoney to testify concerning the annual wages of different job classifications of Johns-Manville employees when the best evidence of such wages would have been actual payroll records.

C. Whether the trial court erred in admitting expert testimony which was speculative, without foundation in fact, was based on assumed facts not in evidence, and was irrelevant.

V. Whether the verdict was supported by sufficient evidence.

VI. Whether Phyllis was entitled to recover damages for loss of consortium and damage to her marriage.

A. Whether the trial court erred in refusing to give Bemis' Tendered Instruction No. 10.

B. Whether the trial court erred in giving its own Instructions Nos. 21 and 31 which allowed Phyllis damages for loss of consortium for periods subsequent to Gary and Phyllis' divorce.

VII. Whether the damages awarded to Gary and Phyllis are so excessive as to shock the conscience of the court and are not supported by the evidence.

## STATEMENT OF THE FACTS

The facts most favorable to the support of the verdict are as follows: On October 19, 1971, at 3:30 p. m., Gary, age 26, whose job classification was a "bagger," was operating a machine called a batt packer which was designed, manufactured and sold by Bemis to Johns-Manville Corporation in 1969. Gary had only worked ten minutes on his shift when the accident happened.

The ultimate function of the batt packer is to pack batts of insulation into heavy paper bags. This is accomplished in two phases. The first phase is a compression phase during which batts are vertically compressed into the compression chamber of the packer to the approximate size of the open end of the bag into which the batts are to be moved horizontally out of the compression chamber. The second phase is the bagging phase during which the bag is filled with compressed batts which have been horizontally pushed from the compression chamber to the shroud assembly area through a square opening in the base of the wall of the compression chamber called a "bag spout." The bagger places the open end of the bag around the mouth of the bag spout and the bag is secured to the mouth of the metal bag spout by a bag clamp. The bag clamp is activated by a push button by the bagger after he places the bag over the mouth of the bag spout. Activation of the bag clamp also activates a seven foot long metal shroud which is located about seven feet directly in front of the bag spout. The shroud is hinged on its bottom end on the frame of the batt packer at the level of the top of the bag spout. Upon activation, the shroud, under power, descends in an arc to a horizontal position above the bag and the very end of the

shroud slightly overlaps the bag spout. The function of the shroud is to hold and to furnish support to the paper bag as it is being filled with batts, to prevent the bag from being torn or ripped. Sometimes it was necessary to hold the bag on the bag spout with the hand until the bag clamp set.

The machine had dual push-button controls, each set consisting of the activating button and an emergency stop button, a set of controls being situated on each side of the machine within reach of the bagger as he placed the bag over the bag spout. In typical operation the bagger would place the open end of the bag over the mouth of the bag spout. This would necessitate his being within the arc of the shroud at that time. He would then punch the push-button which would activate the bag clamp which would set instantly to hold the bag in place. The shroud, being activated at the same time, would commence its descent to a horizontal position, which descent would take four or five seconds.

There was evidence from which the jury could conclude that at the time of the injury Gary had somehow got his hand caught under the bag clamp and was unable to extricate himself to avoid the descending shroud. The shroud caught Gary's head between its end and the bag spout causing severe injuries.

There was evidence that no instructions had been provided by Bemis regarding the specific speed of the shroud's descent, nor warnings regarding the dual controls. There was evidence that no warning was given by Bemis regarding the dangers incident to the shroud's activation. There was evidence that there existed at the time of the manufacture and sale of the machine, feasible and economic safeguards. There was available a two-button control, one for the bag clamp, and a second one for the shroud descent. There were various guards available, and also a single activating button which would be positioned out of the reach of the bagger while he was under the shroud.

As a result of Gary's being struck by the descending shroud, his head was punctured, driving skull fragments into his brain and causing an open wound from which brain matter extruded. Puncture wounds were inflicted in the left temple region and on his chin. Doctors installed a plastic plate in his skull, and certain brain tissues, which cannot be regenerated, were removed. Gary, as a result of the injuries, experiences petit mal and grand mal epileptic seizures. His body and face twitch uncontrollably at times, and one eyelid droops. He cannot maintain normal sexual relations. He suffers from impaired motor and sensory functions on his left side and has 52 percent impairment of functional vision. His physical and mental activities are limited. He should not drive. His personality has been drastically altered, and he is negative, irritable, socially withdrawn and apathetic. He sleeps poorly, and exhibits childlike tendencies and selfish and abusive behavior. He is unemployable but has been continued on at Johns-Manville Corporation out of pity and charity rather than competence. Dr. John Mealy, Jr., described him as being rendered simple-minded. His life expectancy at trial time was 39.10 years.

## I, II A, II B AND V

Bemis under these headings has raised the argument in avoidance of liability that a manufacturer cannot, as a matter of law, be held liable in strict liability situations under § 402A where the injuries were caused by open and obvious dangers in the product's design. This issue was raised on voir dire, in the instruction phase of the trial, and in the court's comments before the jury. It is further raised in specification V that the verdict is not sustained by the evidence. All of the assignments of errors will be discussed together as they involve the same question of law.

The pivotal argument advanced by Bemis is that the functions of the machine were apparent, and the dangers attendant thereto were open and obvious to any person using it, including Gary, an experienced bagger.

The open and obvious rule finds support in Indiana cases, and cases decided in the

Seventh Circuit Court of Appeals applying Indiana law in diversity. The rule may be stated generally as follows: In the area of products liability, based upon negligence or based upon strict liability under § 402A of the Restatement (Second) of Torts, to impress liability upon manufacturers, the defect must be hidden and not normally observable, constituting a latent danger in the use of the product. Although the manufacturer who has actual or constructive knowledge of an unobservable defect or danger is subject to liability for failure to warn of the danger, he has no duty to warn if the danger is open and obvious to all. *See Huff v. White Motor Corporation*, 565 F.2d 104 (7th Cir. 1977); *Burton v. L. O. Smith Foundry Products Co.*, 529 F.2d 108 (7th Cir. 1976); *Posey v. Clark Equipment Company*, 409 F.2d 560 (7th Cir. 1969); *Indiana National Bank of Indianapolis v. DeLaval Separator Co.*, 389 F.2d 674 (7th Cir. 1968); *Cates v. Jolley*, (1978) Ind., 373 N.E.2d 877; *Hunsberger v. Wyman*, (1966) 247 Ind. 369, 216 N.E.2d 345; *J. I. Case Company v. Sandefur*, (1964) 245 Ind. 213, 197 N.E.2d 519; *Nissen Trampoline Company v. Terre Haute First National Bank*, (1975) Ind.App., 332 N.E.2d 820, *rev'd on other grounds*, 265 Ind. 457, 358 N.E.2d 974.

█ Bemis argues that the open and obvious concept as recited by the above cases states a separate doctrine, and if the defect is not latent, but is open and obvious, the plaintiff cannot recover regardless of the surrounding circumstances. We disagree. Our reading of the Indiana cases, starting with *J. I. Case Company, supra*, indicates that the rule was recited in connection with the duty to warn where latent defects exist. Indiana courts have never faced an application of the rule straight-on. While we admit the viability of the concept, we do not concede the application urged by Bemis.

█ In addition to the open and obvious rule, various other rules and concepts have been developed by the courts in the application of § 402A. At least three types of unreasonably dangerous defects may exist under § 402A. A product may be defective because of (1) manufacturing flaws, (2) defective designs, and (3) failure to supply complete information about the product's dangers. *Burton, supra.* Restatement (Second) of Torts § 402A, Comments j and k. A product, although virtually faultless in design, material and workmanship, may be considered defective so as to impose strict liability where the manufacturer fails to discharge a duty to warn or instruct with respect to potential dangers in the use of the product. *Nissen Trampoline Company, supra.* A product may fail to meet reasonable safety expectations by failing to cope with foreseeable mishaps, by lacking feasible safety devices. *Gilbert v. Stone City Construction Company, Inc.*, (1976) Ind. App., 357 N.E.2d 738. Misuse of a product and incurred risk are defenses. *Dias v. Daisy-Heddon*, (1979) Ind.App., 390 N.E.2d 222. Unavoidably dangerous, but useful and desirable, products exist and are marketed, but liability does not attach if adequate warning and instructions are given. Restatement (Second) of Torts § 402A, Comment k. We do not intend here to make any exhaustive analysis of the whole field, but suffice to say the foregoing are some of the considerations.

The basic premise for the imposition of strict liability is stated in § 402A as follows:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, . . ."

Comment g to § 402A adds the following:

"The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him. . . ."

Comment i discusses and defines "unreasonably dangerous" as follows:

"The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. Many products cannot possibly be made entirely safe for all consumption, and any food or drug

necessarily involves some risk of harm, if only from over-consumption. Ordinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini as an instrument of torture. That is not what is meant by 'unreasonably dangerous' in this Section. The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. Good whiskey is not unreasonably dangerous merely because it will make some people drunk, and is especially dangerous to alcoholics; but bad whiskey, containing a dangerous amount of fusel oil, is unreasonably dangerous. Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous. Good butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks; but bad butter, contaminated with poisonous fish oil, is unreasonably dangerous."

■■■ As recited in Comment i, to be actionable under § 402A, the injury-producing product must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. It is contemplated by Comment i that people can be harmed by almost any product, but the harm is not actionable unless the product is unreasonably dangerous, that is, dangerous to an extent beyond that which is contemplated by the ordinary consumer, with the ordinary knowledge common to the community as to its characteristics.

It is to be expected that certain products, whose dangers are obvious and commonly known, such as a sharp knife, an ax, or dynamite, would not be actionable under § 402A because, while dangerous, and capable of causing harm, they would not be unreasonably dangerous because their characteristics are contemplated by the ordinary consumer with ordinary knowledge in the community. Prosser, Law of Torts § 96, p. 649 (4th ed. 1971). With other products, embodying complex and sophisticated technology, incomprehensible to all but practitioners of the art, the dangers are not so obvious and may not be appreciated by an ordinary consumer with ordinary knowledge in the community, even though the dangers may be appreciated by the sophisticated.

■■ The proper role of the open and obvious rule is that it is but one of the factors which must be considered in determining whether a product is in a defective condition unreasonably dangerous. This, like the determination of negligence, requires judgment in a given situation. This is a question for the determination of the jury under proper instructions in any given case. *Gilbert, supra.* The trier must determine from the evidence, including a consideration of evidence of any open and obvious dangerous characteristics of a product, along with other factors, the ultimate question of whether the product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer, with the ordinary knowledge common to the community.

■ The trier may also consider from the evidence, if relevant to the particular case, what an ordinary consumer may contemplate in regard to a product, what is ordinary knowledge of a product in a community, whether feasible safeguards exist, whether the plaintiff appreciated the danger or incurred the risk, whether the product was misused, whether proper warning was given, whether the product was unavoidably dangerous, and any other relevant factors, in determining the ultimate question of whether the product was in a defective condition unreasonably dangerous, that is, dangerous to an extent beyond that which is contemplated by the ordinary consumer, with the ordinary knowledge common to the community as to the product's characteristics.

We are of the opinion that the foregoing application of the open and obvious rule will

afford some flexibility in meeting the variety of situations which may present themselves.

■■■■ The open and obvious rule has further application where the defense of incurred risk is asserted. Incurred risk is concerned with voluntariness and involves a mental state of venturousness. It has a subjective quality. Incurred risk is concerned with a user's age, experience, knowledge and understanding, as well as the obviousness of the defect and the danger it poses. *Kroger Company v. Haun*, (1978) Ind.App., 379 N.E.2d 1004.

■■■ Here the trial court refused to give Bemis' Tendered Instructions Nos. 4 and 5 which would have told the jury that if the dangers were open and obvious, the plaintiff was precluded from recovery, and that Bemis was not required to furnish safeguards or warnings if the danger was open and obvious. The court instead instructed the jury by the court's Instruction No. 7 that a product may be defective and unreasonably dangerous because of design deficiencies, and inadequacies in warning and/or instructions for the use and handling of the product. The court instructed the jury by its Instruction No. 8 that if the batt packer was defective in that there was no guard system to prevent the shroud from descending upon a person under its arc, and that no adequate warning was given, the fact that the danger was open and obvious would not necessarily and in and of itself deny recovery under § 402A. The instruction further told the jury that they could consider any open and obvious characteristics of the machine in determining whether the machine was defective and unreasonably dangerous, and whether the plaintiff incurred the risk of injury from that condition.

In view of the foregoing discussion, we are of the opinion the rulings on the instructions and on voir dire, and the statements before the jury in regard to the open and obvious rule were not error.

■■■ In regard to Bemis' assignment of errors that the verdict was not supported by sufficient evidence, where the sufficiency of the evidence is questioned on appeal, the reviewing court will not weigh the evidence but will consider only the evidence most favorable to the appellee, together with all of the reasonable inferences to be drawn therefrom. *Shipley v. City of South Bend*, (1978) Ind.App., 372 N.E.2d 490; *Department of Commerce v. Glick*, (1978) Ind. App., 372 N.E.2d 479. The Court of Appeals will affirm the judgment if it can be sustained upon any theory. *City of Fort Wayne v. Bishop*, (1950) 228 Ind. 304, 92 N.E.2d 544; *Monumental Life Insurance Company v. Hakey*, (1976) Ind.App., 354 N.E.2d 333.

■■■ Under this assignment Bemis reiterates its argument relative to an open and obvious rule, which we have discussed above. Suffice to say here, there was evidence of probative value from which the jury could conclude that feasible safeguards existed, and their absence rendered the machine unreasonably dangerous. The evidence does not disclose that such an open and obvious danger existed that, as a matter of law, the machine was not in a defective condition, unreasonably dangerous. The jury was not compelled to conclude that the possibility of getting his hand caught in the bag clamp, thus preventing escape from the shroud in its descending arc, was sufficiently open and obvious that it precluded the plaintiff's recovery, even though the injury-producing operations of the shroud were open and obvious.

### III A

Bemis alleges that the trial court committed reversible error in refusing to define "unreasonably dangerous" under the strict liability theory, as defined by its Tendered Instruction No. 3. We do not agree with Bemis' contention.

■■■ As stated in *Barnes v. Deville*, (1973) 155 Ind.App. 387, 293 N.E.2d 54, 57:

"It is a well settled rule in Indiana that, where instructions adequately and fully instruct the jury on the issues of the case, it is not necessary to repeat or dupli-

cate instructions. The rule is also well settled that an instruction may be properly refused even though it is a correct statement of the law and is supported by evidence, where other instructions have sufficiently covered the area."

So long as the instructions considered as a whole fairly and clearly present the law, it may not be presumed that the jury was misled. *Moore v. Rose-Hulman Institute of Technology*, (1975) 165 Ind.App. 165, 331 N.E.2d 462.

The court informed the jury that they must find the batt packer unreasonably dangerous in order to allow Gary to recover in Instructions Nos. 1, 2, 6, 7, 8, 9, 14 and 15. The court further instructed, in Instruction No. 1, that the batt packing machine must be "dangerous to an extent beyond that which would be contemplated by an ordinary consumer who purchased the batt packer or for those whose use it was intended." Additionally, Instruction No. 7 provided:

"A product may be defective and unreasonably dangerous, because of design, deficiencies or inadequacies and/or because of deficiencies or inadequacies in warnings and/or for instructions for the use and handling of the product."

Finally, Instruction No. 15 informed the jury that:

"There is no duty or obligation upon the manufacturer and seller of a product to produce a completely fool-proof or accident proof product, and no such duty rested upon the defendant with regard to the Batt Packer in this case. Defendant's duty to the purchaser and user of the number 18000–58 Batt Packer in this case was to produce and deliver a machine which was reasonably safe for its intended use and which was not defective and unreasonably dangerous to the user of the machine."

■ We think that the instructions, taken as a whole, fairly, and adequately defined and conceptually represented to the jury the term "unreasonably dangerous."

### III B

Bemis next alleges that it was error for the court to give Instruction No. 10 which stated that:

"Where the seller of a product has reason to anticipate that danger to person or property may result from a particular foreseeable use of that product, the seller is required to give adequate warning of the danger, and a product sold without such adequate warning is in a defective condition . . . .,"

Bemis contends the instruction premised Bemis' liability on a failure to warn of *any* design danger, instead of on a failure to warn of "unreasonable dangers." Again, we cannot agree with Bemis.

The jury was thoroughly instructed that the product had to be found defective and unreasonably dangerous before liability could attach in Instructions Nos. 1, 2, 6, 8, 9, 15, 16 and 17. They were told that a failure to give adequate warnings could render the product defective in Instructions Nos. 7 and 10. Further, the jury was told that any obvious condition of the product was a factor to be considered in determining whether the product was unreasonably dangerous and whether Gary incurred the risk in Instructions Nos. 11 and 12.

■ Considering the instructions as a whole, we find that Instruction No. 10 was an adequate statement of the law. *See Moore, supra.*

### III C

Bemis next objects to Instruction No. 8 because it feels the instruction assumes it was proper for Gary to be in the path of the moving part of the batt packer which injured him when, in fact, such issue was for the jury's decision. We fail to see that Bemis' objection to this instruction is relevant.

■ The instruction here questioned did not make an assumption that Gary was "properly" in the path of the shroud's descent. It in no way removed from the jury the question of fact concerning whether Gary was properly or improperly within the

arc of the moving shroud. The instruction in no way indicated that an element of Gary's case was proven or that an aspect of the manufacturer's defense was unprovable. The instruction goes directly to the patent danger rule in stating: If the batt packer was defective and unreasonably dangerous, and if the jury found that the defective or unreasonably dangerous propensities of the batt packer were patent, then the patency of the danger would not, as a matter of law, preclude Gary from recovery, but such patent conditions should be considered in determining whether the batt packer indeed was defective and whether Gary voluntarily incurred the risk.

That such an instruction was necessary is shown by our discussion in I and II A and B, *supra.*

### III D AND E

Bemis alleges that it was error for the trial court to give its Instruction No. 14, which stated in relevant part:

" * * *

On the other hand, if you find from a preponderance of the evidence that the Batt Packing Machine was not defective and unreasonably dangerous, and that the sole cause of Gerald Rubush's injuries was his own negligence, then the plaintiffs cannot recover in this action."

Bemis alleges that the instruction resulted in reversible error because to find for Bemis, the jury had to find two things: 1) that the batt packer was not defective/unreasonably dangerous, and, 2) that Gary was contributorily negligent in causing his injury. Bemis argues that this misstated the law because if Gary's injuries were proximately caused by his own conduct, he could still recover against Bemis.

If Instruction No. 14 were to stand alone before the jury, Bemis' argument would carry more weight; as it is, Bemis' allegation fails to construe the instructions taken as a whole.

Instruction No. 2 informed the jury that for Gary to recover, he had the burden of proving *each* of four propositions, two of which follow:

" * * *

3) That the batt packaging machine in question was defective and unreasonably dangerous to the user.

4) That as a proximate cause of the defective and unreasonably dangerous condition of the batt packaging machine in question, the plaintiff Gerald G. Rubush was injured. . . ."

The court then went on to define proximate cause and its relation to the injury in question in Instruction Nos. 5 and 9. Further, the court's Instruction Nos. 5 and 9 explained that if Bemis produced and delivered a machine which was reasonably safe for its intended use and which was not defective or unreasonably dangerous to the user of the machine, then it could not be held liable for the user's injuries.

In determining the propriety of instructions given in a case, they must be considered as a whole and with reference to each other and not as isolated independent instructions. Instructions are sufficient if, considering them as a whole, the jury has been fully and fairly instructed. *Moore, supra.* We feel that the instructions here given did fairly instruct the jury and that Instruction No. 14 was not error.

### III F

Bemis' next allegation of error is the court's giving of Instruction No. 12 which instructed the jury that in determining whether Gary Rubush incurred the risk of his injury, the jury could consider that a factory worker assigned to operate a particular machine known by him to be dangerous does not necessarily incur the risk of his injury if the nature of his employment requires exposure to certain hazards and if the apparent danger is such that a man of ordinary prudence would take the risk in order to comply with his employer's order. Bemis contends this misstated Indiana law on the doctrine of incurred risk by telling the jury that the employer's order to operate the batt packer would relieve Gary of the consequences of his own action and by implying that such an order militated

against a finding that Gary incurred the risk of operating the machine dangerously. In short, Bemis argues that the instruction informed the jury that one does not act *voluntarily* if one, of his own volition, undertakes a dangerous act because he fears losing his job or incurring his employer's displeasure if he refuses to do the act.

We believe Bemis' interpretation of the thrust of this instruction is incorrect. The court said that acceptance of an assignment to a machine known to be dangerous is not *necessarily* incurrence of the risk. The use of the word "necessarily" implies that acceptance of the assignment weighs heavily as an indication that the worker incurred the risk of injury, but that there are instances where such incurrence of risk should not be found, those instances being where the nature of the employment mandates that a worker expose himself to certain hazards and where an ordinary prudent man would recognize these hazards and their unavoidability and would nonetheless assume, and reasonably so, the risk of being injured in the line of work. We do not find this to be an incorrect statement of the Indiana law of incurred risk as applicable to the case at bar.

Bemis' reliance on *Meadowlark Farms, Inc. v. Warken*, (1978) Ind.App., 376 N.E.2d 122, both to support its definition of incurred risk as applicable to the case at bar, and to support its contention that an employee assumes all the risks of which he has notice, whether ordinary, or extraordinary, so long as they are incidental to the employment, is ill-placed. *Meadowlark Farms, Inc.* is a negligence action while the case at bar sounded in strict liability in tort under § 402A.

In *Cornette v. Searjeant Metal Products, Inc.*, (1970) 147 Ind.App. 46, 258 N.E.2d 652, this court expressly recognized incurred risk as a defense to strict liability under § 402A, citing Comment n to § 402A which demonstrates that such terms as "incurred risk" are often used in a special sense in products liability cases. *See* 46 A.L.R.3d 240, at 246. While the defense of incurred risk in negligence law is that one incurs all the ordinary and usual risks of an act upon which he voluntarily enters, so long as those risks are known and understood by him, *Kroger Company, supra*, the defense of incurred risk under § 402A is that "[i]f the user . . . discovers the defect and is aware of the danger, and nevertheless proceeds *unreasonably* to make use of the product and is injured by it, he is barred from recovery." (Emphasis added.) Comment n to § 402A. Thus, under negligence law, the defense is a subjective one; under strict liability law, the defense is an objective-subjective hybrid. *See Kroger Company, supra; Gregory v. White Truck & Equipment Co., Inc.*, (1975) 163 Ind.App. 240, 323 N.E.2d 280.

When Instruction No. 11, which defined the defense of incurred risk in an objective-subjective fashion in keeping with *Kroger Company, supra*, and to which Bemis did not object, is read in conjunction with Instruction No. 12, the jury was adequately and properly instructed as to the defense of incurred risk and its application to the case at bar. No error can be found in the giving of the challenged instruction.

### IV A

Bemis next contends that the court committed error in refusing Bemis the right to impeach the witness, Gary Mackey, by showing prior inconsistent statements allegedly made by the witness out of court. The sequence of events is as follows: Gary Mackey testified. His testimony covered 31 pages in the transcript. In response to a question on cross-examination, he said that he had been interviewed about the accident by Virgil Mahoney about an hour after its occurrence. He further testified that he told Virgil Mahoney the same things he had testified to in court, and denied that he had changed his story. No specific impeaching question was asked. This exchange occurred on the nineteenth page of his testimony.

Later Virgil Mahoney testified and stated upon cross-examination that he had interviewed witness Mackey. He was then asked what Mackey told him at the first interview concerning what Mackey saw at

the scene of the accident. Objection was made by Gary on the ground that if it were an impeaching question, a proper foundation had not first been laid, and if it were not, the evidence was hearsay. This objection was sustained by the court.

■■■ An impeaching process of a witness is multistaged. First, the necessary foundation must be laid by calling the witness' attention to the time when, the place where, and the person to whom the contradictory statement was alleged to have been made. Secondly, the statement must be read to the witness, or at least he must be advised of the substance of it. Finally, at some future part of the proceeding the witness may explain the statement and/or present evidence of prior consistent statements. The purpose of the rule is to give the witness warning to enable him to prepare to disprove it or to explain it away if admitted. *Carroll v. State*, (1975) 263 Ind. 696, 338 N.E.2d 264; *Gradison v. State*, (1973) 260 Ind. 688, 300 N.E.2d 67.

■■■ Bemis argues that the question asked of Mackey of whether he had told the same story to Mahoney was sufficient to pose the impeaching question. We are of the opinion that the proper foundation was not laid. Mackey's testimony covered 31 pages in the transcript, and he was interrogated on diverse subjects. The impeaching question should be pointed, and call the subject matter to the witness' attention concisely to the area desired.

■■■ Bemis further predicates error on the trial court's refusal to permit an answer to a question submitted to Virgil Mahoney on cross-examination as to whether Mahoney had told Bemis' investigator that Mackey had changed his story. We view this as an indirect attempt to impeach the witness Mackey when he could not impeach him directly because of the failure to lay the proper foundation.

We find no error in the court's ruling in this regard.

## IV B

■■■ Bemis next challenges as error the court's permitting Virgil Mahoney to testify as to Gary's lost wages and impaired earnings. Virgil Mahoney had been an employee of Johns-Manville Corporation for 30 years and was Gary's supervisor. He testified without objection that he knew the present job that Gary held at Johns-Manville, its hourly rate, and the job Gary had held at the time of the injury, and its hourly rate of pay. He testified about the incentive pay afforded at the previous position Gary held as a bagger, and that if he had remained at the old job Gary would be making considerably more money, as the present job does not have incentive pay. Bemis objected to a question asked Mahoney as to whether he knew how much more Gary could be making in the old job. There had been testimony that Gary could not perform the old job.

The error asserted is based on the proposition that the best evidence would be the corporate records, and that Bemis was prejudiced in that it was not able to cross-examine the underlying record. Bemis cites *Arnett v. Helvie*, (1971) 148 Ind.App. 476, 267 N.E.2d 864. This case is not helpful to Bemis. That case concerned a witness who, while being unfamiliar with a particular farm, still attempted to testify about the income off it from his knowledge of other farms and national averages. The tenants and other persons who were familiar with the farm were available and in the court room. The court ruled that the testimony of witnesses more familiar with the farm was the best evidence.

■■■ Citations are not necessary to justify the best evidence rule because of its generality. However, Bemis has not convinced us that Mahoney's testimony was within the rule. His long years of service and knowledge of wage scales, incentive programs, productivity, etc. certainly qualified him to explain such matters to the court and jury. The remainder of his testimony was a simple mathematical calculation. Questions concerning the competence and qualifications of a witness and the admissibility of evidence are addressed to the sound discretion of the trial court. No

abuse of that discretion has been shown, and the court's ruling thereon is not error.

### IV C

Bemis next asserts that the trial court erred in admitting testimony which was speculative, was without foundation in fact, was based upon assumed facts not in evidence, and was irrelevant. This assignment of alleged error concerned the testimony of Dr. Richard L. Fox and Dr. Thomas Manos. Both witnesses are licensed engineers and are professors of mechanical engineering specializing in machine design. Their expert opinions were based upon examination of the machine, its instruction and service manuals, plans and drawings, photographs, study of the operation of the machine, movie film, experiments with the machine, and measurements. Based upon these studies each concluded that the machine was not reasonably safe for its intended use.

 The trial court is vested with broad discretion in determining both the qualifications of experts and the nature of admissible testimony. *Hartzler v. Chesapeake and Ohio Railway Company*, 433 F.2d 104 (7th Cir. 1970); *Lengyel v. Hecht*, (1968) 143 Ind.App. 660, 242 N.E.2d 135. Exercise of such discretion will not be reversed unless a clear abuse thereof is shown. *City of Bloomington v. Holt*, (1977) Ind.App., 361 N.E.2d 1211. Bemis has not demonstrated any such abuse of discretion, and we find no error in the court's ruling.

### VI A AND B

Bemis' next allegation of error is that the trial court erred in refusing Bemis' Tendered Instruction No. 10 and in giving the court's Instructions Nos. 21 and 31. Bemis' instruction would have instructed the jury that the period of time for which Phyllis Rubush could be compensated for loss of consortium ended with the pretrial dissolution of her marriage to Gary. The court, however, instructed the jury that, if it found that the dissolution of the Rubush marriage was a proximate result of Gary's injuries, the jury could consider as an element of any damage to Phyllis the value of her loss of consortium after the date of the dissolution.

Consortium is a right growing out of the marital relation, 41 C.J.S. *Husband and Wife* § 11 (1944), and is defined in Black's Law Dictionary 712 (rev. 4th ed. 1968) as:

> "[c]onjugal fellowship of husband and wife, and the right of each to the company, cooperation, affection, and aid of the other in every conjugal relation."

In *Troue v. Marker*, (1969) 253 Ind. 284, 252 N.E.2d 800, our Supreme Court recognized for the first time in Indiana a wife's independent cause of action for loss of consortium due to negligent injury to her husband and defined "consortium," at 291, as "intangible mental and emotional elements" as well as "services and charges which one partner in the marriage performs for the other and [which] have a monetary and pecuniary value", but not including "[the] monetary value of the direct support owed by a husband to a wife."

 Indiana courts have long recognized that where the same wrongful act which caused the loss of consortium also caused the death of the spouse, the period of time for which recovery for loss of consortium may be had is limited to the time between the commission of the injury and the date of the death of the injured spouse. *Burk v. Anderson*, (1952) 232 Ind. 77, 109 N.E.2d 407; *Long v. Morrison*, (1860) 14 Ind. 595. This necessarily implies that the defendant cannot be assessed damages for causing the surviving spouse's widowerhood or widowhood during which the surviving spouse would, without question, be without those benefits from the late spouse covered by the rubric "consortium." Bemis argues that, as with death, dissolution of marriage marks the end of the compensable period for loss of consortium. We agree.

We reject the Rubushes' attempt to justify recovery beyond the end of the marriage by drawing an analogy between this aspect of Phyllis' action and an action for alienation of affection. Our legislature has abolished the civil cause of action for alienation of affection, Ind.Code 34–4–4–1, and our

Supreme Court upheld the constitutionality of this legislative action in *Pennington v. Stewart*, (1937) 212 Ind. 553, 10 N.E.2d 619.

We do agree that under strict liability in tort, a manufacturer is liable for all injuries proximately caused by a defect in his product but remind the Rubushes that:

"[t]his requirement of proximate cause is usually phrased in terms of foreseeability of danger or harm, with foreseeability held to mean that which it is objectively reasonable to expect, not merely what might conceivably occur."

72 C.J.S.Supp. *Products Liability* § 30 (1975). The dissolution of the Rubush marriage and the resulting loss by Phyllis of all those benefits covered by the rubric "consortium" would not be harms objectively reasonable to expect from the actions of Bemis in the case at bar regardless of how the Rubushes chose to label Phyllis' cause of action. Further, to allow Phyllis this element of recovery would be to judicially recognize a cause of action 'for "wrongful divorce" and this we will not do.

Although the trial court instructed the jury that it could consider the fact of the dissolution and evidence that Phyllis intended to remarry in mitigation of her damages, we must conclude the court's instructions incorrectly stated the law dealing with damages for loss of consortium, and we cannot conclude the jury could not have been misled. Therefore, the court's giving of these instructions was reversible error. *See Birdsong v. ITT Continental Baking Company*, (1974) 160 Ind.App. 411, 312 N.E.2d 104. We, therefore, need not address Bemis' allegation that the award of damages to Phyllis was excessive.

The award of damages to Phyllis must be reversed and her cause of action for loss of consortium remanded for a new trial solely on the issue of damages.

## VII

Bemis next contends that the damages awarded Gary are excessive.

The amount of recovery, where damages are not a mere matter of computation, is largely within the discretion of the trier of the facts, and will not be disturbed by the reviewing court on the grounds of excessiveness unless the award is so grossly, outrageously great as to indicate prejudice, partiality, corruption or other improper motive. *Palace Bar, Inc. v. Fearnot*, (1978) Ind.App., 376 N.E.2d 1159, *rev'd on other grounds*, Ind., 381 N.E.2d 858; *Jos. Schlitz Brewing Company v. Central Beverage Co., Inc.*, (1977) Ind.App., 359 N.E.2d 566. The amount assessed must appear to be so outrageous as to impress the court at first blush with its enormity. The fact that a trial court or jury assessed higher damages than this court would have assessed is no reason why the judgment should be set aside. *Swift and Company v. Palmer*, (1967) 141 Ind.App. 378, 228 N.E.2d 38.

With the foregoing standards of review in mind, and in view of the evidence of Gary's age, prior good health, his capacity for vigorous activity, the substantial evidence, both from lay and professional witnesses, as to the critical and permanent nature of the injuries, as recited in the statement of facts, we cannot say that the damages are excessive as a matter of law.

For the above reasons, the judgment in favor of Gerald G. Rubush is affirmed; the judgment in favor of Phyllis C. Rubush is reversed, and a new trial ordered on damages only.

Affirmed in part; reversed in part.

ROBERTSON, P. J., and YOUNG, J. (participating by designation), concur.