BEMIS COMPANY, INC., and Wabash
Products, Division of Bemis Co.,
Inc., Appellants,

v.

Gerald G. RUBUSH and Phyllis C.
Rubush, Appellees.

No. 1181S319.

Supreme Court of Indiana.

Nov. 12, 1981.

Arthur P. Kalleres, David L. Gray, Ice, Miller, Donadio & Ryan, Indianapolis, C. Thomas Cone, Williams, Cone & Billings, Greenfield, for appellants.

Howard J. DeTrude, Jr., Peter G. Tamulonis, C. Warren Holland, Kightlinger, Young, Gray & DeTrude, Holland & Tabor, Indianapolis, for appellees.

PIVARNIK, Justice.

This cause comes to us on a Petition to Transfer from the First District Court of Appeals, brought by Defendants-Appellants, Bemis Company, Inc., and Wabash Products, Division of Bemis Company, Inc. A judgment of seven hundred seventy-five thousand dollars ($775,000) was entered against petitioner. Seven hundred fifty thousand dollars ($750,000) in damages was awarded to Gerald Rubush and twenty-five thousand dollars ($25,000) was awarded to Phyllis Rubush. Petitioner appealed from this judgment and the Court of Appeals affirmed the judgment in favor of Gerald C. Rubush and reversed the judgment in favor of Phyllis C. Rubush and remanded her cause of action for loss of consortium for a new trial on damages only. *Bemis Co., Inc., v. Rubush*, (1980) 401 N.E.2d 48. Petitioner now seeks transfer of this cause.

The cause was tried in the trial court on the theory of strict liability in tort under § 402A of the Restatement (Second) of Torts (1965). The Court of Appeals affirmed the trial court in its application of § 402A which permitted Bemis to be found liable in strict liability even though the danger was open and obvious. We find the Court of Appeals and the trial court to be in error in their interpretation of strict liability in tort under § 402A and accordingly grant transfer and vacate the opinion of the Court of Appeals.

Gerald G. Rubush was employed as a bagger on a fiber glass insulation batt packing machine for Johns-Manville Corporation. The evidence was that Rubush was an experienced bagger although he had been working on the particular job for only about ten minutes when he was injured on October 19, 1971. The batt packing ma-chine was designed by Bemis Company, Inc., and Wabash Products Co., Division of Bemis Co., Inc., (both hereinafter referred to as Bemis). While working as a bagger on the batt packer and during the course of the batt packer's operation, Rubush was struck in the head by a moving part of the machine. This moving part was called a shroud and it was a visible, moving part of the batt packing machine. Rubush sustained serious injuries to his skull and brain.

The function of the batt packer is to pack batts of insulation into heavy paper bags. This is accomplished in two phases. The first phase is a compression phase in which batts are vertically compressed into the compression chamber of the packer to the approximate size of the open end of the bag. The batts are then moved horizontally out of the compression chamber. The second phase is the bagging phase during which the bag is filled with compressed batts which have been horizontally pushed from the compression chamber to the shroud assembly area through a square opening in the base of the wall of the compression chamber, called a bag spout. The bagger places the open end of a bag around the mouth of the bag spout, the top of which is about 23 inches from the ground, and the bag is secured to the mouth of the metal bag spout by a bag clamp. The bag clamp is activated by a push button which is located at chest or shoulder height and is one of three buttons on a panel. The bag clamp button is pushed by the bagger after he places the bag over the mouth of the bag spout. Activation of the bag clamp also activates a seven-foot long metal shroud which is located directly in front of the bag spout. The shroud is hinged on its bottom end on the frame of the batt packer at the level of the top of the bag spout. When the bagger pushes the bag clamp button the bag is clamped and the shroud descends under power in an arc to a horizontal position above the bag. The end of the shroud slightly overlaps the bag spout. The function of the shroud is to furnish support to the paper bag as it is being filled with batts, to prevent the bag

from being torn. The batt packer had two sets of push button controls, each set consisting of the activating bag clamp button, a bag release button and an emergency stop button. A set of controls was situated on each side of the machine.

In a typical operation the bagger would place the open end of the bag over the mouth of the bag spout. This would necessitate his being within the arc of the shroud at that time. He would then push the bag clamp button which is located at chest level and be turning away from the machine. The bag clamp would set instantly to hold the bag in place. The shroud, being activated at the same time, would commence its descent to a horizontal position, which descent would take four or five seconds. The shroud would descend at a rate of one to one and one-half feet per second and would have the basic pushing force which would come from an air cylinder rather than that which would come from a sudden impact. There was evidence that the timing of the descent of the shroud could be adjusted and that it was adjusted in the Johns-Manville plant after some study and investigation at a rate that would allow the slowest worker to move back after the bag clamp was secured and before the shroud came down to the spout.

There was evidence that Rubush may have caught his hand under the bag clamp and was unable to extricate himself to avoid the descending shroud. There was testimony that it was sometimes necessary to hold the bag on the bag spout with the hand until the bag clamp set, but not where a hand would be clamped. One witness testified that when injured, Rubush appeared to have his hand caught, then fell away from the machine. There was evidence that one could place a hand under the clamp if the fingers were extended, but that it was not necessary to do so and that it would be unreasonable and unlikely that anyone would do so. It would be difficult for one to get his hands in such a position that the bag clamp would clamp down on the hands, and there would be no need for a bagger to have his hands in that area at any time during the operation. If one's

hands were under the clamp when it set, they would have been subjected to 1400 pounds of pressure. It would have been nearly impossible to have removed them without releasing the clamp. Releasing the clamp would cause the shroud to retract and prevent descent. Medical witnesses testified that there was no demonstration of trauma on Rubush's hand which might be expected if it had been clamped. Rubush was operating two machines simultaneously by loading one and then turning to load the other one. The typical operation was for one bagger to load one machine. In short, there existed a situation where no one testified he actually knew how the accident happened. Rubush was unable to recall the occurrence, and attempts to explain or reconstruct the incident were fraught with inconsistencies.

There was no evidence that the machine had malfunctioned or that there was a defect in its operation. Similar batt packers had been used during a 10-year period from 1961–1971 without any reports of workers having gotten hands caught in bag clamps. In 1969, BP 18 and BP 19 were purchased and had been used before and after Rubush's injury without any other injuries having been reported. No modifications were made after the accident and the machine was tested for malfunctions by examination of mechanics, pipe fitters and electricians, and reviewed by an accident review committee. It was determined that there was nothing wrong with the machine involved, either mechanically or electrically. The same batt packer was used after the accident without changes, additions, guarding apparatus or alterations.

Appellees admit that the descent of the shroud was an open and obvious danger which was well known to the operators of the machines and which would be obvious to anyone observing the machine. They contend that the danger in the machine was the fact that the machine could operate so that the shroud could descend with any object, or anyone within the path of the shroud which they have designated as a "zone of danger." Their claim is that the

machine should have been made so that it was impossible for the shroud to descend, or that there should have been some kind of automatic device which would have prevented its descent if anything were in its path. They claim the failure to so design the machine is a defect.

Bemis' main contention is that it cannot be held liable in strict liability under § 402A since any dangers in the descending shroud were open and obvious rather than latent or hidden defects that required a warning to the user. The evidence was without conflict both by oral testimony of witnesses and by demonstrative evidence in the form of drawings, diagrams, and movies of the batt packer machine showing that the descent of the shroud in the operation of the batt packing procedure was open, obvious, and apparent to anyone using it. The descent was caused when the batt packer pushed the button. The evidence was that personnel of Johns-Manville trained batt packers and taught them proper use of the machine and all were aware of the operation of the machine and the dangers of the descending shroud. They presented evidence that types of guards such as photo electric cells, sweeps or other devices were considered and rejected as not being effective, necessary, or economically feasible. Similar evidence was heard with regard to the placement of more remote control buttons with arguments made that they would make the machine more dangerous and open to being activated by persons other than the bagger himself.

■ The basic premise for the imposition of strict liability is stated in § 402A as follows:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, . . . ."

Comment g to § 402A adds the following:

"The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him . . . ."

Comment i discusses and defines "unreasonably dangerous" as follows:

"The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer . . . ."

Hence, to be actionable under § 402A, the injury-producing product must be unreasonably dangerous, that is, dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. The harm is not actionable unless the product is "unreasonably dangerous."

■ As noted above, Bemis' principal argument is that the functions of the machine were apparent, and any dangers were open and obvious to any person using it. The open and obvious rule finds support in Indiana cases and cases decided in federal courts applying Indiana law in diversity. The rule may be stated generally as follows: In the area of products liability, based upon negligence or based upon strict liability under § 402A of the Restatement (Second) of Torts, to impress liability upon manufacturers, the defect must be hidden and not normally observable, constituting a latent danger in the use of the product. Although the manufacturer who has actual or constructive knowledge of an unobservable defect or danger is subject to liability for failure to warn of the danger, he has no duty to warn if the danger is open and obvious to all. *See Burton v. L. O. Smith Foundry Products Co.*, 529 F.2d 108 (7th Cir. 1976); *Posey v. Clark Equipment Company,* 409 F.2d 560 (7th Cir. 1969); *Greeno v. Clark Equipment Co.*, 237 F.Supp. 427 (N.D.Ind.1965); and *J. I. Case Company v. Sandefur,* (1964) 245 Ind. 213, 197 N.E.2d 519.

*J. I. Case Co., v. Sandefur, supra,* included the following discussion:

"As stated by the leading authorities, public policy has compelled this gradual change in the common law because of the

industrial age where there is no longer the usual privity of contract between the user and the maker of a manufactured machine. On the other hand, there must be reasonable freedom and protection for the manufacturer. He is not an insurer against accident and is not obligated to produce only accident-proof machines. The emphasis is on the duty to avoid hidden defects or concealed dangers."

245 Ind. at 222, 197 N.E.2d at 523.

The Court, in *Sandefur, supra*, discussed its reasoning further as follows:

"A manufacturer may determine the character of the materials to be used primarily for the purpose of producing or manufacturing an 'economy model,' as compared with a luxury model—the life of one being much less than the life of the other. Yet there are reasonable limits on such 'economy', for example: a machine may not be built with extremely weak or flimsy parts concealed by an exterior such as to mislead a user into believing it safe and stable when, in fact, it is not, thus causing a user to rely thereon, to his injury. This again is a question of fact, namely, was there a concealed defect or hidden danger to a user?"

245 Ind. 222–23, 197 N.E.2d at 523.

In *Greeno, supra*, Judge Eschbach stated: "A defective condition is a condition not contemplated by the consumer-user and which is unreasonably dangerous to him or his property, that is, more dangerous than would be contemplated by the ordinary consumer-user with the ordinary knowledge of the community as to its characteristics and uses. *Restatement, supra, Comment* at 351–52. An axe is not unreasonably dangerous because, as in negligence law, users would contemplate the obvious dangers involved. But a farm combine with a weak lid over the auger would constitute an unreasonable danger because such a danger is beyond the contemplation of ordinary users."

237 F.Supp. at 429.

Several allegations of error were raised relating to this general rule. They involved the conduct of *voir dire*, instructions given and refused and the court's comments before the jury. They also relate to the allegation that the verdict is not sustained by the evidence. The Court of Appeals found no error in these issues. We disagree.

During *voir dire* counsel for Bemis sought to question the potential jurors on the open and obvious rule but was prevented from doing so by the trial judge. Bemis tendered final instructions 4 and 5 which stated that a manufacturer is not obligated to design an accident-proof machine, but a reasonably safe one which does not contain hidden or concealed defects and, in brief, stated the open and obvious rule. The trial court refused to give Bemis' instructions 4 and 5 and also refused their tendered instruction No. 3, which provided:

"The plaintiffs, in order to prevail here, must establish by a preponderance of the evidence *each* of the following:

*First*, that at the time the Batt Packer in question was supplied by the defendant it was in a defective and unreasonably dangerous condition not contemplated by the ultimate consumer such that it was dangerous to an extent beyond that which would have been contemplated by the ordinary consumer who purchased or used it with like age, judgment, experience, and knowledge as that which was possessed by the plaintiff at the time of his injury.

*Second*, that the Batt Packer was expected to and did reach the ultimate consumer without substantial change in its condition;

*Third*, that plaintiff's injuries were a direct and proximate result of said defective and unreasonably dangerous condition.

If you find that the plaintiffs have established each of these elements, your verdict should be for the plaintiffs, unless you find for the defendant on its affirmative defenses. On the other hand, if you do not find that plaintiffs proved each of these elements by a preponderance of the evidence, then you should find for the defendant, without regard to whether de-

fendant has proved its affirmative defenses.

\* \* \* \* \* \*

The trial court failed to define unreasonably dangerous under the strict liability theory as was set out in defendant's tendered instruction 3. This failure to instruct was also compounded when the jury was allowed to hear, over the objection of Bemis, the testimony of Dr. Richard L. Fox, a professor of engineering at Case Western Reserve University, who was called as an expert witness in the field of machine design and qualified as such. He defined "unreasonable hazard" as follows:

"[A] hazard or risk in a product is unreasonable if it could be removed and the cost of removal is not significant nor the cost of removal does not seriously reduce the utility of the product. This is a basic definition. In other words basically in simple words it says if you can get rid of the hazard at little cost you have no business leaving it in, so it is unreasonable to leave it in, and this is, this is the term that we use."

He testified further as to ways in which the machine could have been made safer. Dr. Manos, another expert witness, testified similarly. The jury could have relied on this definition then, and determined that even though the dangerous characteristic of the descending shroud was open and obvious to Rubush as he operated the machine, and known to him, they could find Bemis liable for not conforming to the standards set by Dr. Fox and Dr. Manos. This would make manufacturers insurors of any product they put in the open market and render them liable for injuries and damages to those using the machine regardless of the facts and circumstances surrounding the injury. This is not the law in Indiana.

In *Posey v. Clark Equipment Co., supra,* plaintiff was operating a fork lift truck manufactured by Clark Equipment Co., when a carton from a high stack became dislodged and fell on him, causing serious injuries. The fork lift truck was capable of lifting an article to 106 inches, but did not have an overhead guard to protect the oper-

ator from falling objects. Plaintiff's employer wanted the fork lift to be designed as low as possible so that it could enter areas such as street trucks with low head room. An overhead guard was available and could have been mounted on the truck in the space of ten minutes, but this would have made the lift stand too high to be driven into the back of a truck. While using the equipment in this condition, Posey was taking cartons from a lower stack when the movement caused a higher stack to sway and cause a carton at the top of the higher stack to fall on him. Judge Dillin, of the Southern District Court, directed a verdict in favor of the defendant, and appeal was taken to the Seventh Circuit Court of Appeals. In affirming the District Court, the Seventh Circuit Court of Appeals observed:

"Posey's theory appears to be that if there had been a warning notice on the truck, the employer might have purchased a guard and instructed his employees to install it whenever the truck was used among high stacks, and Posey, as well as other employees, would have been alerted to the importance of using the guard.

In directing a verdict, Judge Dillin concluded that the danger of an object falling upon an unprotected operator was so obvious that the user of the truck would reasonably be expected to know about it."

409 F.2d at 563.

The court then further observed that a warning may be necessary to prevent the product from being unreasonably dangerous, but a seller is not required to warn when the danger, or potentiality of danger is generally known and recognized. The court then found that the District Judge had properly directed the verdict in favor of the defendant since any ordinary user or operator of fork lifts would recognize the danger facing Posey as he drove the fork lift truck in the area of high stacks while unprotected and that it was not a situation where only persons of special experience would realize the danger which might befall an unprotected operator. Therefore there

was no evidence to support a finding that Clark had a duty, under the circumstances, to supply a warning notice.

██ In the present case, the danger of the shroud operating under power were open and obvious. The operator of the machine was familiar with and aware of the dangers in the descending shroud. The court erred in refusing to instruct the jury on the open and obvious rule and in failing to define "unreasonably dangerous."

██ Other issues which were raised in this cause relate to the plaintiff's conduct and the instructions which were given on negligence and incurred risk. Instruction 14 stated that in order to find for Bemis the jury had to find that the batt packer was not defective or unreasonably dangerous, and that Gary was contributorily negligent in causing his injury. Bemis argues that this misstated the law because if Gary's injuries were proximately caused by his own conduct, he could still recover against Bemis. We find this argument persuasive. It is especially significant since this instruction was argued to the jury by counsel and Rubushs' counsel read part of that instruction to the jury and interpreted it.

These errors are especially relevant in view of the fact that there was no explanation given as to how the accident had occurred. One witness testified that he thought Mr. Rubush caught his hand. One of plaintiff's expert witnesses, Dr. Manos, testified that he was totally unable to scientifically determine how the accident occurred. Dr. Fox, another plaintiff's expert, admitted he did not have any facts as to how the accident happened and that it was irrelevant to him how the accident occurred. Testimony was heard from witnesses as to the feasibility of guards, or the use of photo electric cells or remote controls. Therefore, there was much speculation about the cause of the accident and about possible guards or warnings, none of which speculation was clearly related to the facts of this accident and how it occurred.

██ Additional errors occurred when the jury was incorrectly instructed that if it found that the dissolution of the Rubush marriage was a proximate result of Gary Rubush's injuries, they could consider the value of Phyllis Rubush's loss of consortium after the date of the dissolution as an element of damage. In view of our disposition of this case, further discussion of these errors is not necessary.

For the above reasons, transfer is granted, the Court of Appeals opinion is vacated and this cause is remanded to the trial court with directions to enter judgment for defendants-appellants Bemis Company, Inc., and Wabash Products, Division of Bemis Company, Inc.

GIVAN, C. J., and PRENTICE, J., concur.

HUNTER, J., dissents with separate opinion in which DeBRULER, J., concurs.

DeBRULER, J., dissents with separate opinion in which HUNTER, J., concurs.

DeBRULER, Justice dissenting.

The Court of Appeals concluded that the trial judge correctly instructed the jury on the strict liability claim. I agree. The Products Liability Act was not in existence at the time of the trial below. *J. I. Case Co. v. Sandefur*, (1963) 245 Ind. 213, 197 N.E.2d 519, had held that privity of contract between the manufacturer and injured user was no longer a necessary element in a suit by the latter against the former for negligent manufacture of a product with hidden defects. *Ayr-Way Stores, Inc. v. Chitwood*, (1973) 261 Ind. 86, 300 N.E.2d 335, following its predecessor cases in the Courts of Appeal, had held that the negligence of a manufacturer need not be proven in a suit against it by one injured through use of its product, and also changed the formulation of the basic duty of the manufacturer towards users of its product. *J. I. Case Co. v. Sandefur, supra*, regarded the legal duty of the manufacturer to be to avoid hidden defects and concealed dangers in its products. *Ayr-Way Stores, Inc. v. Chitwood, supra*, requires the manufacturer to avoid defective conditions unreasonably dangerous to users. The question of the

manner in which courts should deal with evidence that the defective condition of a product would be open and obvious to the average user in the aftermath of *Ayr-Way Stores, Inc.*, was not addressed by this Court. The trial judge below responded in substance by instructing the jury that it was authorized to consider evidence of the fact that any defective condition was open, apparent, and obvious to the user, in determining whether the machine was defective and unreasonably dangerous in having no guard system or in providing no adequate warnings but that a finding of the open and obvious defect would not in and of itself necessarily preclude recovery. Thus, in the trial court's mind, and I think correctly so, "hidden defects and concealed dangers" was subsumed within the new standard, "defective condition unreasonably dangerous", and the new focus was no longer upon whether the defects and dangers of the product were hidden and concealed, but upon whether they were unreasonable. Hidden and concealed defects and dangers may be unreasonable, and again they may not be. Open and obvious dangers may be reasonable, and again they may not be. Dangers in machines like the batt packer can, where the machine is started and stopped many times within the space of an hour in an assembly-line, mind-dulling fashion, under the standard applicable here, be both open and obvious and unreasonable, since knowledge of them would not arm the user to avoid injury.

The operator of this machine activated two phases by a single manual button. A button was also provided at the same location to shut the machine off. Upon activation, the clamps closed, thereby securing the paper bag to the spout and simultaneously the shroud descended. During normal operation it was sometimes necessary to hold the paper bag with the hand until the bag clamp set. Bemis concedes this hands-on necessity. Obviously, given this necessity, it was often necessary for the operator to hold the bag on the spout with one hand and activate the clamp with the other, while still in a position to be struck by the descending shroud. There was no safety device which would automatically stop the descent of the shroud in the event that the operator was caught in the machine and the shroud met resistance. One could only shut the machine down manually in such emergency circumstances.

A reasonable trier of fact could look to this evidence and reasonable inferences therefrom, and reasonably conclude that it is more probable than not that this machine as manufactured was in a defective condition unreasonably dangerous to the user. Any power-driven machine which is designed so as to require the operator to keep a part of the body in a position to be cut, mashed, or struck, until the power is engaged and its operation commenced, presents a case for the jury, on this element of the strict liability claim. In operation, this bagging machine required the operator to keep his hand and arm at the spout, under the arc traveled by the shroud, when activating the machine.

In order to prove a strict liability claim, the plaintiff must also present evidence that he has been injured by the product. *Cornette v. Searjeant Metal Products, Inc.*, (1970) 147 Ind.App. 46, 258 N.E.2d 652. The above-mentioned evidence and reasonable inferences therefrom is sufficient to warrant the trier of fact in concluding that it is more probable than not that plaintiff was injured by the product. He was required on occasion to use his hands to hold the bag on the spout so that it would be caught under the clamp. His hand was in fact caught under the clamp during operation, and he was held close to the machine and crushed by the descending shroud on it. The sufficiency of evidence on other elements of the claim is not in issue. I believe, therefore, that the trial court correctly put this case to the jury, and must therefore dissent to the result reached by this Court.

HUNTER, J., concurs.

HUNTER, Justice dissenting.

I must respectfully dissent from the majority opinion. While references to erroneous instructions, improperly admitted evi-

dence, and conflicting testimony occur throughout the opinion, the remedy granted by the majority reveals the rule of law laid down therein. That the majority directs the trial court to *"enter judgment* for defendants-appellants Bemis Company, Inc., and Wabash Products, Division of Bemis Company, Inc." (emphasis added) unmistakably indicates its decision rests on a singular proposition: recovery for injuries suffered at the hands of an "open and obvious danger" are barred as a matter of law under this jurisdiction's interpretation of Section 402A of the Restatement (Second) of Torts (1965). Erroneous instructions or improperly admitted evidence would warrant only a new trial, while the standard of review incumbent upon us—in view of the fact the jury found for plaintiff Rubush—would require us to *affirm* the judgment entered against Bemis Company, Inc., and its subdivision (hereinafter collectively referred to as "Bemis Company").

Numerous considerations not discussed by the majority surround the issue before us. Those concerns were recognized by the Court of Appeals which, based on its extensive analysis, rejected the broad and sweeping rule the majority adopts today as the law of this jurisdiction. For the unanimous Court of Appeals, Judge Neal defined the more moderate stance prevalent among jurisdictions which have considered the question before us:

> *"The proper role of the open and obvious rule is that it is but one of the factors which must be considered in determining whether a product is in a defective condition unreasonably dangerous.* This, like the determination of negligence, requires judgment in a given situation. This is a question for the determination of the jury under proper instructions in any given case. *Gilbert* [*v. Stone City Const. Co., Inc.* (1976) 171 Ind.App. 418, 357 N.E.2d 738] *supra.* The trier must determine from the evidence, including a consideration of evidence of any open and obvious dangerous characteristics of a product, along with other factors, the ultimate question of whether the product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer, with the ordinary knowledge common to the community." *Bemis Co., Inc. v. Rubush,* (1980) Ind.App., 401 N.E.2d 48, 57; [emphasis added].

Similarly, the extensive analysis of the precise question before us in Note, *Indiana's Obvious Danger Rule for Products Liability,* 12 Ind.L.Rev. 397 (1979) culminates in the conclusion that the position adopted by the majority is a "harsh and anachronistic rule" which defies the considerations underlying the law of products liability. *Id.* at 398. In virtually prescient fashion, the commentator has contemplated and decried the possibility that dictum contained in our federal diversity case law would lead us to the position the majority adopts today. *Id.*

Other jurisdictions, however, have rejected outright the notion that under the law of products liability, recovery for injuries sustained at the hands of an "open and obvious" or "patent" danger should be barred as a matter of law. *See, e. g., Byrns v. Riddell, Inc.,* (1976) 113 Ariz. 264, 267, 550 P.2d 1065, 1068 ("We do not subscribe to this 'patent-latent' distinction...."); *Pike v. Hough Co.,* (1970) 2 Cal.3d 465, 474, 85 Cal.Rptr. 629, 635, 467 P.2d 229, 235 ("... the modern approach does not preclude liability solely because a danger is obvious."); *Auburn Mach. Works Co., Inc. v. Jones,* (1979) Fla., 366 So.2d 1167 ("We reject the [patent danger] doctrine...."); *Byrnes v. Economic Machinery Company,* (1972) 41 Mich.App. 192, 202, 200 N.W.2d 104, 109 ("... awareness alone does not preclude negligence."); *Brown v. North Am. Mfg. Co.,* (1978) 176 Mont. 98, 106, 576 P.2d 711, 717 ("We reject such a rule [open and obvious danger]."); *Bexiga v. Havir Mfg. Co.,* (1972) 60 N.J. 402, 412, 290 A.2d 281, 286 ("It would be anomalous to hold that defendant has a duty to install safety devices but a breach of that duty results in no liability for the very injury the duty was meant to protect against."); *Micallef v. Miehle Co.,* (1976) 39 N.Y.2d 376, 379, 384 N.Y.S.2d 115, 348 N.E.2d 571, 573 ("The time has come to depart from the patent danger rule...."); *Dorsey v. Yoder Com-*

*pany,* (E.D.Pa.1971) 331 F.Supp. 753, 759 (applying Pennsylvania law) ("... even though the danger of unguarded rotary blades was obvious to plaintiff, this does not *ipso facto* preclude recovery."); *Palmer v. Massey-Ferguson, Inc.,* (1970) 3 Wash. App. 508, 517, 476 P.2d 713, 719 ("The law, we think ought to discourage misdesign rather than encouraging it in its obvious form.").

In *Micallef v. Miehle Co., supra,* New York's highest Court overruled *Campo v. Scofield,* (1950) 301 N.Y. 468, 95 N.E.2d 802, which has long been recognized as the landmark decision in support of the "open and obvious" or "patent" danger rule. Not insignificantly, *Campo* was relied upon by this Court in *J. I. Case Company v. Sandefur,* (1964) 245 Ind. 213, 197 N.E.2d 519, wherein we rejected the rule that privity of contract is necessary to maintain a cause of action against the manufacturer of a product. In *Sandefur,* we cited *Campo* in the following context:

> "As stated by the leading authorities, public policy has compelled this gradual change in the common law because of the industrial age where there is no longer the usual privity of contract between the user and the maker of a manufactured machine. On the other hand, there must be reasonable freedom and protection for the manufacturer. He is not an insurer against accident and is not obligated to produce only accident-proof machines. The emphasis is on the duty to avoid hidden defects or concealed dangers. *Campo v. Scofield* (1950), 301 N.Y. 468, 95 N.E.2d 802." *Id.,* 245 Ind. at 222, 197 N.E.2d at 523.

It is this citation to *Campo,* together with the emphasis in *Sandefur* on the *concealed* danger at issue there, that prompted the dictum in our federal diversity cases from which the majority extracts its extreme position. *See, e. g., Posey v. Clark Equipment Co.,* (7th Cir. 1969) 409 F.2d 560 (citing *Sandefur* for the proposition that "the defect must be hidden"); *Schemel v. General Motors Corp.,* (7th Cir. 1967) 384 F.2d 802 (relying on *Sandefur* and *Campo* for the proposition that a manufacturer's duty is to avoid "latent or concealed dangers"); *Evans v. General Motors,* (7th Cir. 1966) 359 F.2d 822, 824-5 (quoting *Campo* for the proposition that a manufacturer need not "render" a product "more safe where the danger is obvious"). The origin, development, and limitations of our federal case law are fully analyzed in Note, *Indiana's Obvious Danger Rule for Products Liability, supra,* and for purposes of brevity, need not be discussed in the context of this dissenting opinion. It is conceded the language of these decisions provides support for the "open and obvious" bar, as the majority has stated; it is also acknowledged the federal diversity authority is not binding on us insofar as the point of law at issue is concerned. *Chaffin v. Nicosia,* (1974) 261 Ind. 698, 310 N.E.2d 867.

So it is appropriate and prudent that we assess the validity of the "open and obvious danger" rule in the light of the rationale upon which other jurisdictions have rejected it. Those analyses rest on a common premise: prohibiting recovery *as a matter of law* for injuries sustained at the hands of an open and obvious danger defeats the most fundamental considerations which prompted recognition and implementation of Section 402A in our courts of law.

Section 402A embodies the concept of "strict liability" in tort. First embraced in this jurisdiction in *Cornette v. Searjeant Metal Products, Inc.,* (1970) 147 Ind.App. 46, 258 N.E.2d 652; *Perfection Paint & Color Co. v. Konduris,* (1970) 147 Ind.App. 106, 258 N.E.2d 681; and *Ayr-Way Stores, Inc. v. Chitwood,* (1973) 261 Ind. 86, 300 N.E.2d 335, the concept rests on twin propositions: (1) the manufacturer of a product sold on the open market undertakes and assumes a responsibility to the public to produce a reasonably safe product; and (2) the public justifiably relies on the expertise of the manufacturer in its expectation that the product is designed to afford reasonable safety in its foreseeable and intended uses. Restatement (Second) of Torts, § 402A, Comment *c.* These bedrock considerations are supplemented with the policy that primary responsibility for product safety must

lie with the manufacturer who, in addition to his expertise, is in the position to distribute the engineering and production costs of making products safe for their reasonably foreseeable and intended uses. *Id.*

It is these considerations which have prompted our courts to remove products liability from the realm of general negligence principles into the arena of strict—*but not absolute*—liability. It has never been nor should it ever become the rule that a manufacturer is liable for each and every injury suffered in connection with a product; that would clearly be illogical, for the manner in which a product is used must inevitably bear on the question of fault for any injury.

But while absolute liability is not imposed on manufacturers, their responsibilities are elevated beyond the scope of negligence principles. The concept of strict liability in tort places special emphasis on "fault" liability without "connotation of moral blame," as Dean Prosser has explained:

"There is a broader sense in which 'fault' means nothing more than a departure from a standard of conduct required of a man by society for the protection of his neighbors; and if the departure is an innocent one, and the defendant cannot help it, it is none the less a departure, and a social wrong. The distinction still remains between the man who has deviated from the standard, and the man who has not. The defendant may not be to blame for being out of line with what society requires of him, but he is none the less out of line.

"In this broader sense there is 'fault' in much innocent conduct. Tort liability never has been inconsistent with the ignorance which is bliss, or the good intentions with which hell is said to be paved. A trespasser is not excused by the honest, reasonable belief that the land is his own; . . . . There are many situations in which a careful person is held liable for an entirely reasonable mistake. In all this there is nothing new. Socially, and legally, these defendants are at fault; whether they are individually so, in spite of the fact that they are blameless, appears to be entirely a matter of definition, rather than substance, and the argument leads only to a pointless dispute over the meaning of a word." Prosser, *Law of Torts*, ch. 13, p. 493–4 (4th Ed. 1971) [footnotes omitted].

What is demanded of manufacturers by the strictures of Section 402A is that products must not be "unreasonably dangerous" as employed in their reasonably foreseeable or intended use. Restatement (Second) of Torts, § 402A(1).

Whether a manufacturer has satisfied the standard is dependent on the facts of each case; the duty may be violated in various ways, as the Court of Appeals summarized in the instant case:

"In addition to the open and obvious rule, various other rules and concepts have been developed by the courts in the application of § 402A. At least three types of unreasonably dangerous defects may exist under § 402A. A product may be defective because of (1) manufacturing flaws, (2) defective designs, and (3) failure to supply complete information about the product's dangers. *Burton* [*v. L. O. Smith Foundry Products Co.* 529 F.2d 108 (7th Cir. 1976)] *supra*. Restatement (Second) of Torts § 402A, Comments j and k. A product, although virtually faultless in design, material and workmanship, may be considered defective so as to impose strict liability where the manufacturer fails to discharge a duty to warn or instruct with respect to potential dangers in the use of the product. *Nissen Trampoline Company* [*v. Terre Haute First Nat'l Bank* (1975) Ind.App., 332 N.E.2d 820] *supra*. A product may fail to meet reasonable safety expectations by failing to cope with foreseeable mishaps, by lacking feasible safety devices. *Gilbert v. Stone City Construction Company, Inc.,* (1976) [171 Ind.App. 418] 357 N.E.2d 738. Misuse of a product and incurred risk are defenses. *Dias v. Daisy-Heddon,* (1979) Ind.App., 390 N.E.2d 222. Unavoidably dangerous, but useful and desirable, products exist and are marketed,

but liability does not attach if adequate warning and instructions are given. Restatement (Second) of Torts § 402A, Comment k." *Bemis Co., Inc. v. Rubush, supra*, 401 N.E.2d at 56.

Here, as the majority has acknowledged, the allegation faced by Bemis Company is that their product, the batt-packer, was defective in its design. The response of Bemis Company, which is adopted by the majority, is that a product designed so that its danger is "open and obvious" is necessarily not "unreasonably dangerous."

It is a proposition replete with irony. Whereas Section 402A has universally been interpreted to require manufacturers to avoid latent dangers, they are nonetheless told all they need do to escape liability is to make those dangers patent. It is to say that a manufacturer should refrain from installing protective guards on a product, for those guards might only serve to make the danger less "open and obvious." The rule ignores the focus of Section 402A— whether the manufacturer, without impairing the functional capacities of the product and with *reasonable* additional costs—could have rendered the product reasonably safe. The rule, in short, as many jurisdictions have expressly recognized, encourages misdesign in its obvious form. *Palmer v. Massey-Ferguson, Inc., supra; Brown v. North Am. Mfg. Co., supra; Dorsey v. Yoder Company, supra; Auburn Mach. Works Co., Inc. v. Jones, supra; Micallef v. Miehle Co., supra; Pike v. Hough Co., supra.*

Courts and commentators have elaborated on the considerations surrounding products liability which weigh against a flat bar to recovery for injuries suffered at the hands of an open and obvious danger. It has been recognized that notwithstanding the patent nature of a danger, the user of a product may not recognize every risk which his actions entail, nor fully appreciate the gravity of the harm which may follow. Similarly, it has been acknowledged that the gravity of harm which may follow must be assessed with recognition that momentary lapses, whether mental or physical, are part and parcel of the human experience; that is noteworthy in circumstances such as those present here, where Rubush's assembly-line duties included double duty on two batt-packing machines, each operating on a four to five second time frame. Concomitantly, it has been recognized that employee-users of a product cannot purely be characterized as *voluntarily* assuming each and every risk they encounter on the job, for their only option to exposing themselves to an obvious danger may be to foresake the employment. That dubious prospect is exacerbated by the continued and unyielding application of the employment at will doctrine in this jurisdiction. *See, e. g., Campbell v. Eli Lilly & Co.,* (1980) Ind.App., 413 N.E.2d 1054 (Ratliff, J., dissenting in part), *trans. denied* (1981) Ind., 421 N.E.2d 1099 (Hunter, J., dissenting); *Martin v. Platt,* (1979) Ind.App., 386 N.E.2d 1026.

For these various reasons, the jurisdictions cited herein have recognized that manufacturers must bear responsibility to insure that the technology of complicated machinery be not "unreasonably dangerous." To make the danger "open and obvious" does not *per se* satisfy the responsibility, as explained in 2 Harper & James, *The Law of Torts* § 28.5 p. 1543 (1956):

"[T]he bottom does not logically drop out of a negligence case against the maker when it is shown that the purchaser knew of the dangerous condition. Thus if the product is a carrot-topping machine with exposed moving parts, or an electric clothes wringer dangerous to the limbs of the operator, and if it would be feasible for the maker of the product to install a guard or a safety release, it should be a question for the jury whether reasonable care demanded such a precaution, though its absence is obvious. Surely reasonable men might find here a great danger, even to one who knew the condition; and since it was so readily avoidable they might find the maker negligent. Under this analysis the obviousness of a condition will still preclude liability if the obviousness justifies the conclusion that the condition is not unreasonably dangerous; otherwise it would simply be a factor to consider on the issue of negligence." (Footnotes omitted.)

As indicated by Harper and James in their concluding sentence, and as the jurisdictions cited herein have held, the openness and obviousness of the danger should be but one factor in the question whether a product was designed in an unreasonably dangerous manner. As explained in *Micallef v. Miehle Co., supra,* the ultimate question of whether a manufacturer has exercised due care must be resolved on a case-by-case basis:

"What constitutes 'reasonable care' will, of course, vary with the surrounding circumstances and will involve 'a balancing of the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm.' (2 Harper & James, *Torts,* § 28.4; see *Pike v. Hough Co.,* 2 Cal.3d 465, 85 Cal.Rptr. 629, 467 P.2d 229, *supra.*) Under this approach, 'the plaintiff endeavors to show the jury such facts as that competitors used the safety device which was missing here, or that a "cotter pin costing a penny" could have prevented the accident. The defendant points to such matters as cost, function, and competition as narrowing the design choices. He stresses "tradeoffs". If the product would be unworkable when the alleged missing feature was added, or would be so expensive as to be priced out of the market, that would be relevant defense matter' (Rheingold, *Expanding Liability of the Product Supplier: A Primer,* 2 Hofstra L.Rev., 521, 537; see *Wirth v. Clark Equip. Co.,* 457 F.2d 1262, 9 Cir.; *Sutkowski v. Universal Marion Corp.,* 5 Ill.App.3d 313, 281 N.E.2d 749)." *Id.,* 39 N.Y.2d at 386, 384 N.Y.S.2d at 121, 348 N.E.2d at 577–78.

With specificity, Dean Wade, in his persuasive and widely-quoted article, has outlined the particular factors which the factfinder must weigh in the final balance:

"(1) the usefulness and desirability of the product, (2) the availability of other and safer products to meet the same need, (3) the likelihood of injury and its probable seriousness, (4) the obviousness of the danger, (5) common knowledge and normal public expectation of the danger (particularly for established products), (6) the avoidability of injury by care in use of the product (including the effect of instructions or warnings), and (7) the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive." J. Wade, *Strict Liability of Manufacturers,* 19 *Sw. L.J.* 5 (1965).

The efficacy of Dean Wade's approach was delineated by the Florida Supreme Court in *Auburn Mach. Works Co., Inc. v. Jones, supra:*

" 'Taking the Harper and James formulation as expanded by Dean Wade, it becomes understandable why the plaintiff accidentally injured by a knife does not recover from the manufacturer. The product is not *unreasonably* dangerous and no duty arises because (1) everyone realizes the dangers; (2) by definition a guard over the blade (the part that causes danger) would eliminate its utility; (3) the cost of a "safe" knife might be prohibitive. Balancing the likelihood and gravity of harm against the burden of protection, a manufacturer should not be liable for a slip of the knife.

" 'But consider the Yoder machine. Certainly Dorsey knew the danger of unguarded cutters. On the other hand, a guard would not eliminate the machine's usefulness, nor would the cost of $200 to $500 on an $8,000 machine be unreasonable. . . .' 331 F.Supp. at 759–60.

"The patent danger doctrine encourages manufacturers to be outrageous in their design, to eliminate safety devices, and to make hazards obvious. For example, if the cage which is placed on an electric fan as a safety device were left off and someone put his hand in the fan, under this doctrine there would be no duty on the manufacturer as a matter of law. So long as the hazards are obvious, a product could be manufactured without any consideration of safeguards. This example of the fan differs from the example of the knife in *Dorsey v. Yoder Co., supra,* wherein the court explained that the utility of the knife would be eliminated by placing a guard over the blade. As the

New York court in *Micallef* pointed out in discussing reasonable care, the defendant may show as relevant defensive matter the cost, function, and competition as narrowing design choices, the unworkability of the product when the alleged missing feature is added, or that the product would be so expensive as to price it out of the market.

"The patent danger doctrine protects manufacturers who sell negligently designed machines which pose formidable dangers to their users. It puts the entire accidental loss on the injured plaintiff, notwithstanding the fact that the manufacturer was partly at fault." *Id.* at 1170–71.

Here, the Court of Appeals correctly held that the fact the danger was open and obvious was, in view of the nature of the product at issue, only one factor for the jury to consider. As Judge Neal explained for the unanimous Court: "We are of the opinion that the foregoing application of the open and obvious rule will afford some flexibility in meeting the variety of situations which may present themselves." *Bemis Co., Inc. v. Rubush, supra,* 401 N.E.2d at 57–58.

This more moderate rule does not, as the majority states, convert the strict liability imposed on manufacturers into absolute liability. *Brown v. North Am. Mfg. Co., supra.* Proof that an accident occurred does not trigger liability of the manufacturer. Neither, however, should the fact that a danger is open and obvious operate as an *absolute* defense to liability.

Finally, I would note that in enacting our Products Liability Act, which took effect after the date on which this action was conceived, the legislature rejected by implication the rule adopted here by the majority. See Ind.Code § 34–4–20A–1 *et seq.* (Burns 1981 Supp.). The defense outlined in Section 4(b)(1) of the act rests on whether the user's conduct was unreasonable in light of the open danger. That question will, with rare exceptions, be a factual matter for the jury to resolve, as are the applicability of the defenses of incurred risk and assumption of risk in negligence actions. *See generally, Memorial Hospital of South Bend, Inc. v. Scott,* (1973) 261 Ind. 27, 300 N.E.2d 50; *Kroger Co. v. Haun,* (1978) Ind. App., 379 N.E.2d 1004.

In Justice DeBruler's dissenting opinion, which I join, he has laid out the evidence from which the jury, pursuant to the rule of law explained by the Court of Appeals, could have concluded Bemis Company violated its responsibilities in designing the batt-packer. While the record does reveal conflicts in the evidence and the experts' opinions, we cannot, of course, subjectively evaluate the record and overturn the jury's conclusion, even though we might have reached the opposite result had we been the triers of fact. *Meehan v. Meehan,* (1981) Ind., 425 N.E.2d 157. With respect to the instructions and expert testimony the majority has mentioned, the Court of Appeals fully addressed and correctly decided those issues.

For all the foregoing reasons, Bemis Company, Inc.'s petition to transfer should be denied.

I dissent.

DeBRULER, J., concurs.