909 F.2d 1088
 Prod.Liab.Rep.(CCH)P 12,550
Mary J. LOVELL, Personal Representative of the Estate of
James R. Lovell, Jr., Deceased, Plaintiff-Appellant,
v.
MARION POWER SHOVEL COMPANY, INC., and Dresser Industries,
Inc., Defendants-Appellees.
 No. 88-2614.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 29, 1989.
Decided Aug. 13, 1990.
 
 Jon D. Krahulik, James L. Turner, Mary Beth Claus, Bingham, Summers, Welsh & Spilman, Vernon J. Petri, Indianapolis, Ind., for plaintiff-appellant.
 Stephen H. Thomas, Statham, Johnson & McCray, Evansville, Ind., for defendants-appellees.
 Before BAUER, Chief Judge, and EASTERBROOK and KANNE, Circuit Judges.
 KANNE, Circuit Judge.
 
 
 1
 On December 4, 1981, James R. Lovell, Jr. died as a result of injuries sustained when struck by the shoe of an "8950 Dragline." The 8950 Dragline, a large piece of strip-mining machinery, was designed and manufactured by Marion Power Shovel Co. for use by Amax Coal at its Ayrshire mine in southern Indiana. Mary J. Lovell, as personal representative of the estate of James R. Lovell, brought an action against Marion Power under the products liability law of the State of Indiana, Ind.Code Ann. Secs. 33-1-1.5-1 et seq. (West 1983), in which she alleged that Marion Power was strictly liable for the death of her husband. In a subsequent motion for summary judgment, Marion Power argued: (1) that the 8950 Dragline was not "unreasonably dangerous" under the Indiana products liability statute as a matter of law, and (2) that the plaintiff's cause of action was barred by Indiana's "open and obvious danger" rule. The district court granted summary judgment on both grounds. We reverse.
 
 I.
 
 2
 The 8950 Dragline ("the 8950"), also referred to as a "walking dragline", is a large piece of strip-mining machinery the function of which is to remove dirt from the surface of underground coal. To enable it to move from one location in the mine to another, the 8950 is equipped with two "shoes" which resemble long steel girders. While digging, however, the 8950 remains in one location and pivots in a 360-degree radius on a large centrally-located roller bearing. The dragline shoes protrude from each side of the machine a few feet in the air and rotate with the machine at a speed of up to thirty miles per hour. Although the radius of the shoes' swing is fixed at approximately 100 feet, affidavits of various workers familiar with the 8950's operation reveal that the swing of the shoes is deceptive in that it is difficult to tell whether one is within the 100-foot radius. These affidavits also reveal that the 8950's rotation is "silent" in the sense that there is no distinct noise which a bystander could associate with the machine's rotation. The 8950 has one operator who sits in one of two cabs. Because of limited visibility from each cab, the operator is unable to view the area to the rear of the 8950 or anything in close proximity on the ground below. Despite these "blind spots," the 8950 did not have a backup alarm or video equipment to warn bystanders and/or the machine operator of any danger resulting from the deceptive swing radius of the shoes. Mirrors and a whistle had been installed in the cab, however, to alleviate some of the dangers associated with these blind spots.
 
 
 3
 An employee of Amax Coal for twelve years, James Lovell was the Machine Supervisor of the 8950 during the four-year period immediately preceding the accident. In that capacity, he was responsible for the day-to-day activities of the 8950, including the provision of safety training to the groundmen and other employees who worked in and around the 8950. This safety training included instruction about the deceptive nature of the shoes' swing radius. Indeed, the training manual which Mr. Lovell used specifically referred to this potential hazard. It warned, "Know the swing radius of the widest part of the machine. The shoes swing can be deceiving so be sure." Amax Task Training Manual, p. 31. It is undisputed that Mr. Lovell was well-aware of the dangerous propensities of the shoes' swing radius and the fact that there was no backup alarm or video equipment to warn bystanders of that potential hazard.
 
 
 4
 On the afternoon of the accident, James Lovell was working at the Ayrshire mine near the 8950 which was "benching" near a roadway created for mine traffic.[1] The 8950 was positioned closer to the roadway than was normal making the available passage space for mine traffic on that roadway narrower than usual. In mid-afternoon, two Amax employees in a truck were proceeding from south to north on the roadway past the 8950. The 8950 was positioned on the east side of the road, with the "pit highwall" located directly to its north. The "bench" was located directly across the roadway to the west. As was required by established safety procedures, the driver of the truck stopped prior to entering the boom radius of the dragline to let the operator of the 8950 know that he wished to pass. The 8950 operator, after acknowledging the driver's signal and motioning him to proceed, began rotating the 8950 from the bench to the pit highwall. Shortly after he had entered the swing radius of the dragline's rotating shoe, however, the driver stopped the truck. Apparently, the passenger in the truck wished to talk to Mr. Lovell who was walking toward the dragline from the south. At this point, both Mr. Lovell and the truck were within the sweep of the dragline's shoe. Before the driver could move the truck, however, the shoe struck them both. Mr. Lovell was pinned against the truck as the shoe passed and died as a result of the injuries he sustained in that blow. The operator of the dragline did not see Mr. Lovell and was not aware of the accident until after it had occurred.
 
 II.
 
 5
 In her Amended Complaint, Mrs. Lovell alleged that Marion Power sold the 8950 Dragline to Amax Coal in a defective and unreasonably dangerous condition. Specifically, she referenced the 8950's "blind spots" and argued that "mirrors and/or other devices" should have been installed to minimize the risk of injury such as that sustained by Mr. Lovell. Summary judgment was granted in favor of Marion Power on two separate grounds.
 
 A. Indiana's Open and Obvious Rule
 
 6
 Relying upon Bryant-Poff, Inc. v. Hahn, 454 N.E.2d 1223, 1225 (Ind.App. 1 Dist.1982), the district court concluded that the "open and obvious" nature of the danger presented by the 8950's rotating shoes barred the plaintiff's recovery in this case. In Hahn, the Indiana Court of Appeals relied upon Bemis Company, Inc. v. Rubush, 427 N.E.2d 1058 (Ind.1981), cert. denied, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982), in which the Indiana Supreme Court held that liability could not be imposed under Sec. 402A of the Restatement (Second) of Torts if the danger from which the injury was sustained was "open and obvious" to the injured party. Id. at 1061.
 
 
 7
 This absolute bar to liability, adopted first by the state's highest court in Bemis and relied upon by the district court below, is no longer the law in Indiana. Under FMC Corp. v. Brown, 551 N.E.2d 444 (Ind.1990), the mere fact that a product may present a hazard which is "open and obvious" no longer acts as an absolute bar to a plaintiff's recovery for injuries sustained as a result of that hazard.[2] Specifically, the Indiana Supreme Court stated:
 
 
 8
 The open and obvious danger rule asserted in Bemis Co. v. Rubush, (1981), Ind. 427 N.E.2d 1058, does not apply to strict liability claims under the Product Liability Act. Koske, et ux v. Townsend Engineering, (1990), Ind. 551 N.E.2d 437. It is now clear that evidence tending to prove an observable danger or defect of a product is simply that, evidence relevant and material to the issue of whether the product was defective and unreasonably dangerous....
 
 
 9
 Id. at 446. Thus, although the district court's reliance on Bemis was well-founded at the time, summary judgment can no longer be based solely on that ground under Indiana law.
 
 
 10
 B. Defective and Unreasonably Dangerous Condition
 
 
 11
 If a defendant can show that there is no genuine issue of material fact as to whether a product was provided in a defective and unreasonably dangerous condition under the Indiana Product Liability Act of 1978, summary judgment may be appropriate. Koske v. Townsend Engineering Co., 551 N.E.2d 437, 442-43 (Ind.1990). As previously interpreted, a product was "unreasonably dangerous" when it was "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Bemis, 427 N.E.2d at 1061; Corbin v. Coleco Industries, Inc., 748 F.2d 411, 419 (7th Cir.1984); see also Restatement (Second) of Torts Sec. 402A, comments g and i (applying a "consumer expectation" test to determine whether product is unreasonably dangerous). Although this determination has traditionally been considered one of fact for the jury, Corbin, 748 F.2d at 419, the district court applied the "consumer expectation" test to the facts of this case and concluded that there were no material issues of fact as to whether the 8950 was dangerous to an extent beyond that contemplated by Mr. Lovell or other employees at Amax Coal. In light of the Indiana Supreme Court's decisions in FMC Corp., supra, and Koske, supra, we conclude that the plaintiff's allegations have raised material issues of fact as to the "unreasonable dangerousness" of the 8950.
 
 
 12
 In arriving at this conclusion, we do not dispute Marion Power's contention that under the language of the "consumer expectation" test summary judgment was probably appropriate. Mr. Lovell was not only cognizant of the deceptive swing radius of the dragline's shoes, he was responsible for the provision of safety instruction to other Amax employees on precisely that hazard. It is also apparent that Mr. Lovell was aware of the fact that persons in close proximity to the machine could not count on the operator to see them and warn them of any impending danger. In light of all of this, it is difficult to perceive a jury concluding that the 8950 was dangerous to an extent not contemplated by Mr. Lovell. Indeed, this understanding of "unreasonably dangerous" receives some support from language in the Koske decision, wherein the court stated, "in determining whether a product was sold in a defective condition unreasonably dangerous to a user, considerations must necessarily include the reasonably anticipated knowledge, perception, appreciation, circumstances, and behavior of expected users." 551 N.E.2d at 440-41. Apparently, however, this is not an exclusive list. As an additional factor, the Indiana Supreme Court also permits juries to consider the extent to which additional feasible safety devices could have been added to make the product more safe.
 
 
 13
 The Indiana Supreme Court's reliance on this latter factor is found in FMC Corp. v. Brown, supra. In FMC Corp., a crane in operation at a construction site touched a power line electrocuting Danny Brown who was working near the crane. Brown's widow brought a wrongful death products liability action against FMC Corp., the manufacturer of the crane, alleging that the product was "unreasonably dangerous" to users because it was not equipped with a proximity warning device or an insulated link. FMC Corp. motioned the court for summary judgment. In support of that motion, FMC Corp. presented evidence showing that both Brown and the crane operator were aware of the dangers inherent in operating the crane near a power line. Brown's widow responded by presenting evidence regarding the restricted view which the operator of the crane had of his surroundings and, specifically, the extent to which this restricted view limited the operator's ability to judge clearances between the crane and nearby power lines. She also presented evidence which showed that proximity warning devices and insulated links were instruments appreciated in the industrial community for their ability to aid in the prevention of precisely this type of accident. The Indiana Supreme Court affirmed the two lower courts' determinations that summary judgment was inappropriate in this case, noting that the reasonable inferences from the evidence presented by Mrs. Brown might permit a jury to conclude that a "crane without such a safety device was a defective and unreasonably dangerous product and that the failure to install such devices was one proximate cause of Brown's death." 551 F.2d at 446;[3] cf. Miller v. Todd, 551 N.E.2d 1139, 1143 (Ind.1990) (In determining defectiveness of a motorcycle under the "crashworthiness" doctrine of product liability law, a plaintiff should be given the opportunity to demonstrate that a feasible, safer, and more practicable product design might have afforded better protection).
 
 
 14
 As in FMC Corp., evidence was presented by Mrs. Lovell to show that the installation of a backup alarm and/or video camera in the cab of the 8950 may have assisted the machine's operator in viewing the area immediately surrounding the machine. Evidence was also presented to show that these types of safety devices could potentially have prevented exactly the type of accident which forms the basis of this litigation. Under the rationale of FMC Corp., the reasonable inferences from this type of evidence may have permitted the jury to conclude that the absence of these safety devices rendered the 8950 "unreasonably dangerous". We are bound by the Indiana Supreme Court's interpretation of Indiana products liability law and, as such, conclude on the basis of this evidence that summary judgment was inappropriate.
 
 III.
 
 15
 For all of the foregoing reasons, we REVERSE the district court's grant of summary judgment and REMAND for further proceedings.
 
 
 
 [1]
 According to the plaintiff's brief, "benching" is the act of digging material from the "pit highwall" and dumping it in the "bench" area so as to build a new roadway
 
 
 [2]
 Because the injury at issue in Bemis Co., Inc. v. Rubush occurred prior to the enactment of the 1978 Indiana Product Liability Act, 1978 Ind.Acts 141 Sec. 28, the court's decision interpreted Sec. 402A of the Restatement (Second) of Torts. The injury at issue in this case occurred post-1978. As such, this litigation is governed by the 1978 Product Liability Act which "entered, occupied, and preempted the field of product strict liability in tort" and, in so doing, excluded from its provisions the "open and obvious" rule developed in Bemis. Koske v. Townsend Engineering Co., 551 N.E.2d 437, 442 (Ind.1990)
 
 
 [3]
 This same inquiry into the feasibility of additional safety devices had earlier guided the Indiana court of appeals in its resolution of the "unreasonable dangerousness" issue in this case. That court stated, "[t]he question is not whether FMC had a duty to install safety devices, but whether the absence of such devices rendered the product defective and unreasonably dangerous (citation omitted). This was a question of fact." FMC Corp. v. Brown, 526 N.E.2d 719, 726 (Ind.App. 4 Dist.1988)