Roger N. PHELPS, Plaintiff–Appellant,

v.

SHERWOOD MEDICAL INDUSTRIES
and Argyle Associates,
Defendants–Appellees.

No. 86–3119.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 2, 1987.

Decided Dec. 17, 1987.

John M. Marnocha, Doran, Manion, Boynton, Kamm & Esmont, South Bend, Ind., for plaintiff-appellant.

James H. Pankow, Jones, Obenchain, Ford, Pankow, & Lewis, South Bend, Ind., for defendants-appellees.

Before CUMMINGS, CUDAHY and KANNE, Circuit Judges.

CUMMINGS, Circuit Judge.

This diversity strict products liability tort action for $2,000,000 presents various claims of error by the plaintiff involving the district court's giving and refusal to give several jury instructions tendered by the parties. Viewing the instructions provided by the court as a whole, *United States v. Grier*, 823 F.2d 177, 178 (7th Cir.1987), we hold that the charges to the jury concerning both the defendants' duty to warn as well as their defenses to negligence and strict liability accurately led the jury to a proper understanding of the relevant Indiana law. Because those instructions treated the issues fairly and accurately, we affirm the judgment for defendants.

It is important initially to set this products liability case in its proper perspective. In recent years, litigation dealing with the use and side effects of potentially dangerous products such as prescription drugs has increased considerably, creating a greater public awareness of the problems inherent in protecting consumers.[1] Courts also have been deluged with claims of injury resulting from the use of defective medical devices. See, *e.g., Terhune v. A.H. Robbins Co.*, 90 Wash.2d 9, 577 P.2d 975 (1978) (Dalkon Shield litigation). The medical-device industry is a multi-billion dollar enterprise; yet until recently, few medical-device cases were litigated. Foote, *Loops and Loopholes: Hazardous Device Regulation Under the 1976 Medical Device Amendments to the Food, Drug and Cosmetic Act*, 7 ECOLOGY L.Q. 101, 103 (1978). This is surprising, given that the public has been made aware of the problem for at least fifteen years. In 1970, a federal survey of the preceding ten-year period revealed some 512 deaths and 300 injuries connected with heart-valve implants, 89 deaths and 186 injuries from pacemakers, 47 deaths and a number of injuries from anesthesia machines, 28 deaths and 171 injuries from the use of catheters, more than 8,000 injuries caused by intrauterine devices (IUD)—this was before the most recent IUD revelations—more than 2,000 injuries associated with radiation equipment, and scores more injuries related to other devices. See *Hearings on Medical Device Amendments Before Subcommittee on Health of the Senate Committee on Labor and Public Welfare*, 93d Cong., 1st Sess. 877–878 (1973).

■ By definition in the Food, Drug and Cosmetic Act, a "medical device" includes the catheter at issue because it is—

an instrument, apparatus, implement, machine, contrivance, implant, *in vitro* reagent, or other similar or related article, including any component, part, or accessory, which is—

(1) recognized in the official National Formulary, or the United States Pharmacopoeia, or any supplement to them,

(2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or

(3) intended to affect the structure or any function of the body of man or other animals, and which does not achieve any of its principal intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized

---

1. The majority of cases have involved the drug MER/29 (used in the treatment of high cholesterol), see, *e.g., Roginsky v. Richardson–Merrell*, 378 F.2d 832 (2d Cir.1967); the drug Aralen (used in the treatment of rheumatic arthritis), see, *e.g., Hoffman v. Sterling Drug, Inc.*, 485 F.2d 132 (3d Cir.1973); and the drug Chloromycetin (used in the treatment of typhoid fever), see, *e.g., Stottlemire v. Cawood*, 213 F.Supp. 897 (D.D.C.1963). For two classic accounts of the prescription drug problem, see generally J. BLAKE, SAFEGUARDING THE PUBLIC: HISTORICAL ASPECTS OF MEDICINAL DRUG CONTROL (1970) (discussion of vast litigation of the late 1960's) and Rheingold, *Products Liability—The Ethical Drug Manufacturer's Liability*, 18 RUTGERS L.REV. 947 (1964) (comments on general principles of liability). For a comprehensive analysis of the problem of product misrepresentation, see Britain, *Product Honesty is the Best Policy: A Comparison of Doctors' and Manufacturers' Duty to Disclose Drug Risks and the Importance of Consumer Expectations in Determining Product Defect*, 79 NW.U.L.REV. 342 (1984) (adopting the model later demonstrated in M. SHAPO, THE LAW OF PRODUCTS LIABILITY (1987)).

for the achievement of any of its principal intended purposes.

21 U.S.C. § 321(h) (1970). However, plaintiff does not allege that this catheter was misbranded within 21 U.S.C. § 352 for want of adequate labeling.

In the prescription drug area, which has been the focus of substantially more attention than the medical-device industry, manufacturers are required by law to warn the medical profession of all known dangers involved in the use of their products in order to prevent adverse drug effects. 21 C.F.R. § 201.57 (1983).[2] This requirement compels the physician to act as a "learned intermediary," advising his or her patient of the benefits as well as the inherent risks in the use of a particular product. By adequately warning the doctor, the manufacturer fulfills its duty and avoids any liability for failure to warn. See *Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir.1974), certiorari denied, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688.

The Illinois Supreme Court recently adopted this principle in *Kirk v. Michael Reese Hospital and Medical Center*, 117 Ill.2d 507, 111 Ill.Dec. 944, 513 N.E.2d 387 (1987), reversing 136 Ill.App.3d 945, 91 Ill. Dec. 420, 483 N.E.2d 906 (1985), thus joining the majority position regarding prescription drug warnings. A minority of jurisdictions, however, have held that the manufacturer's duty to warn extends beyond the prescribing physician to the consumer. See, *e.g., Lindsay v. Ortho Pharmaceutical Corp.*, 637 F.2d 87 (2d Cir. 1980); *Lukaszewicz v. Ortho Pharmaceutical Corp.*, 510 F.Supp. 961 (E.D.Wis. 1981), amended by 532 F.Supp. 211 (E.D. Wis.1981). Those cases requiring warnings to consumers have involved oral contraceptives: since the dispenser of those products may not be a physician (as in a clinic), the careful balancing of risks to the individual

patient may not occur, and therefore an extended warning is appropriate.

There is a dearth, however, of reported decisions regarding the manufacturer's duty to warn physicians about dangers in the use of medical devices. This case concerns applying the principles of medical-device defect liability to the allegedly defective heart catheter used here. The essential facts, construed as favorably to the defendant (since it won a jury verdict) as the record permits, see *Tippecanoe Beverages, Inc. v. S.A. El Aguila Brewing Co.*, 833 F.2d 633 at 634 (7th Cir.1987), are as follows: Plaintiff Roger N. Phelps, a resident of Indiana, underwent a single coronary artery bypass operation at Memorial Hospital in South Bend, Indiana, on May 18, 1983. During open-heart surgery, Dr. John Rubush inserted a catheter manufactured by the defendants, Sherwood Medical Industries and Argyle Associates ("Sherwood"),[3] into the left atrium of Phelps' heart to monitor his post-operative condition. This catheter was held in place by a "purse-string" suture[4] and pursued a serpentine path to the left atrial cavity.

After the surgery Nurse Lydia Vaught encountered some resistance in attempting to remove the catheter. The catheter broke and a portion remained inside Phelps' heart. Vaught then contacted Rubush's partner, Dr. Ross Gardner. Vaught later testified at trial that had she known the catheter was sutured to Phelps' pulmonary vein, she would not have tried to remove it. Dr. Rubush's deposition was read into evidence. He testified that before this surgery, he had heard of a similar breakage and that the suture to a patient's superior pulmonary vein and the catheter's routing might prevent removal of the catheter.

When Phelps learned about the breakage, he went to the Cleveland Clinic Foundation. After an examination, Dr. Bruce

2. As far as we are advised, no comparable regulation governs medical devices.

3. Sherwood has its principal place of business in Missouri, and Argyle, a division of Sherwood, has its principal place of business in New York. Diversity of citizenship is thus proper under 28 U.S.C. § 1331. See *Rush Presbyterian St. Luke's*

*Medical Center v. Safeco Ins. Co. of America*, 825 F.2d 1204, 1206 (7th Cir.1987).

4. This type of suture "is placed around [the catheter] to hold it in place, not tightly, but [to] hold it there so it doesn't get pulled out and so that [the physician] can easily dislodge it" (Rubush Dep. at pp. 14, 56).

W. Lytle determined that the risks of removing the catheter remnant outweighed the risks of leaving it in his heart, stating: "Our conclusions are that we do not think that it is in the patient's interest to have anything done about this foreign body at this time" (Pl.Ex. 9).

Both sides produced demonstrative evidence and expert testimony at trial. Phelps contended that Sherwood was liable because its catheter broke upon Nurse Vaught's attempted removal. Phelps claims that this was due to an alleged defect in the catheter's inability to stretch before separating. Furthermore, he alleged that Sherwood failed to warn of this potential hazard. All these issues went to the jury, which ultimately found for Sherwood. On appeal, Phelps attacks the giving of five of Sherwood's instructions and the refusal of four of his proposed instructions. In reviewing the trial court's actions, some deference should be accorded to that court's interpretation of Indiana law. *Rush Presbyterian St. Luke's Medical Center v. Safeco Ins. Co. of America*, 825 F.2d 1204, 1206 (7th Cir.1987). Moreover, regarding Phelps' claims of erroneous instructions, the district court's judgment will not be overturned unless we are persuaded that the jury's understanding of the issues was seriously affected to Phelps' prejudice. *Sherrod v. Berry*, 827 F.2d 195, 203 (7th Cir.1987).

Probably the principal and most interesting issue pressed on appeal—the one that deserves the greatest attention—concerns Phelps' primary claim that Sherwood had a duty to warn users of the catheter "down-line" (defendants' terminology) from Dr. Rubush, the operating surgeon. Rubush was warned by the label on the container that the catheter was not to be removed while its needle was in place. Neither Phelps' counsel's brief nor his oral argument attacks the adequacy of that warning. Instead he contends that the trial court erred by instructing the jury in a strict products liability action under Indiana law that the "user" of the catheter employed in Phelps' open-heart surgery was Rubush so that he was the sole person

entitled to a warning. At the close of the evidence, the district court gave portions of Sherwood's instructions numbers two and five and refused Phelps' tendered instruction number ten. The court instructed the jurors:

> If you find from the evidence in this case that Doctor Rubush had knowledge, in his intended use of this Defendants' catheter, that there was danger of breaking of said catheter upon attempted removal because of the route and obstructions existent in the application of this catheter, then you are instructed that the Defendants had no duty to warn with respect to such potential properties since they were already known *to the user, the operating surgeon.* (Emphasis added) (Sup.App. 72–73).

The court further instructed the jury that:

> In this case the user of the product is the operating surgeon, Doctor Rubush (Sup. App. 74).

The court thus limited Sherwood's duty to warn to Rubush as the "user" or consumer of the product. Phelps contends the duty extended at least to Nurse Vaught, who attempted to remove the catheter, and perhaps even to Phelps, whose body is unfortunately "using" the catheter to this day. He argues that there was no Indiana law supporting the district court's instruction and that a warning by Sherwood, if required, should have a broader scope and should not merely be limited to the "operating surgeon," Rubush. Sherwood responds that it had the duty to warn only Rubush, who, as a "learned intermediary," should then have passed on any potential dangers of catheter use to Vaught and Phelps. See *Ortho Pharmaceutical Corp. v. Chapman*, 180 Ind.App. 33, 388 N.E.2d 541 (1979); cf. *Hoffman v. E.W. Bliss Co.*, 448 N.E.2d 277 (Ind.1983). Because the only effective warning to prevent the catheter's separation could arguably have been given to Rubush, who was required to read the instructions on the product's use, Sherwood claims that it did not breach any requisite duty by failing to warn either Vaught or Phelps of any possible hazardous consequences.

Initially this Court must examine Indiana strict products liability law in order to determine Phelps' burden of proof in his action for strict liability. In 1978, the Indiana legislature codified the doctrine of strict products liability in Indiana Code § 33-1-1.5-3. Section 33-1-1.5-3 states:

Sec. 3. Codification and Restatement of Strict Liability in Tort. The common law of this state with respect to strict liability in tort is codified and restated as follows:

(a) One who sells any product in a defective condition unreasonably dangerous to any user or consumer or to his property is subject to liability for physical harm thereby caused to the user or consumer or to his property if that user or consumer is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition, and, if:

(1) the seller is engaged in the business of selling such a product, and

(2) the product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(b) The rule stated in Subsection (a) applies although:

(1) the seller has exercised all possible care in the preparation and sale of this product, and

(2) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Ind.Code § 33-1-1.5-3 (1983 Supp.). Thus, to establish liability on Sherwood's part, Phelps is required to demonstrate that Sherwood sold a "product in a defective condition unreasonably dangerous to any user." Ind.Code § 33-1-1.5-3(a) (1983 Supp.). In *Bemis Company, Inc. v. Rubush*, 427 N.E.2d 1058, 1061 (Ind.1981), the Indiana Supreme Court explained that in order for a plaintiff to prevail in a products liability case under a theory of strict liability, he or she must establish that the allegedly defective product was dangerous in a way that an ordinary user of the product would not expect. The defect also "must be hidden and not normally observable, constituting a latent danger in the use of the product" before a manufacturer is liable under the Indiana product liability statute. *Id.* See also *Bridgewater v. Economy Engineering Company*, 486 N.E.2d 484, 489 (Ind.1985). Moreover, in *J.I. Case Company v. Sandefur*, 245 Ind. 213, 197 N.E.2d 519, 523 (1964), cited and quoted with approval in *Bemis*, 427 N.E.2d at 1062, the court stated that "[t]here must be reasonable freedom and protection for the manufacturer. He is not an insurer against accident and is not obligated to produce only accident-proof machines." *Id.* Under Indiana law, "[t]he emphasis is on the duty to avoid hidden defects or concealed dangers." *Id.* See generally *Bishop v. Firestone Tire & Rubber Co.*, 814 F.2d 437, 440 (7th Cir.1987) (discussing Indiana law).

Under the present statute adopted in 1978, Indiana law defines "user" of a product as follows:

"User or consumer" means a purchaser, any individual who uses or consumes the product, *or any other person who, while acting for or on behalf of the injured party,* was in possession and control of the product in question, or any bystander injured by the product who would reasonably be expected to be in the vicinity of the product during its reasonably expected use.

Ind.Code § 33-1-1.5-2 (emphasis added). This term is further explained by comment 1 to Restatement of Torts (Second) § 402(A), which reads, in part, as follows:

User or consumer. In order for the rule stated in this Section to apply, it is not necessary that the ultimate user or consumer have acquired the product directly from the seller, although the rule applies equally if he does so. He may have acquired it through one or more intermediate dealers. It is not even necessary that the consumer have purchased the product at all. He may be a member of the family of the final purchaser, or his employee, or a guest at his table, or a mere donee from the purchaser. The liability stated is one in tort, and does not require any contractual relation, or privi-

ty of contract, between the plaintiff and the defendant.

"Consumers" include not only those who in fact consume the product, *but also who prepare it for consumption;* and the housewife who contracts tularemia while cooking rabbits for her husband is included within the rule stated in this Section, as is also the husband who is opening a bottle of beer for his wife to drink. Consumption includes all ultimate uses for which the product is intended, and the customer in a beauty shop to whose hair a permanent wave solution is applied by the shop is a consumer. "User" includes those who are passively enjoying the benefit of the product, as in the case of passengers in automobiles or airplanes, *as well as those who are utilizing it for the purpose of doing work upon it,* as in the case of an employee of the ultimate buyer who is making repairs upon the automobile which he has purchased.

Restatement (Second) of Torts § 402(A), comment 1 (1977) (emphasis added). Further, a product is considered defective, pursuant to Indiana law, if the seller fails to:

[G]ive reasonably complete instructions on proper use of the product; when the seller, by exercising reasonable diligence, could have made such warnings or instructions available to the user or consumer.

Ind.Code § 33–1–1.5–2.5(b)(2). By law, the catheter in this case could only be sold to physicians; thus Sherwood claims that only Rubush, and not Sherwood, should have warned either Vaught or Phelps, neither of whom was the "user or consumer."

*Physician as User or Consumer.* Should Rubush be considered a "consumer" or "user" of the catheter for purposes of this case? There are no reported Indiana cases directly on point, but *Chapman* holds that a prescription drug manufacturer need only warn the patient's physician and by analogy controls here (see *supra,* p. 301 and *infra,* p. 304). Similarly, in treating a physician as the "consumer" of a drug, the California appellate court in *Carmichael v. Reitz,* 17 Cal.App.3d 958, 95 Cal.Rptr. 381 (1971), concluded that a contraceptive drug, Enovid, was unreasonably dangerous to an extent beyond what would be contemplated by a physician with the ordinary knowledge common to the medical community. In *Carmichael,* a patient sued the treating physicians, medical clinic, and drug manufacturer for pulmonary embolisms and thrombophlebitis allegedly caused by the drug. The court in *Carmichael* concluded that "the prescribing doctor ... in reality stands in the shoes of the 'ordinary consumer'" (17 Cal.App.3d at 989, 95 Cal.Rptr. at 401), and the defendant drug manufacturer was not held strictly liable. See also Note, Oksenholt v. Lederle Laboratories: *The Physician As Consumer,* 79 Nw.U.L.Rev. 460, 476–479 (1984).[5]

Here Rubush stood in a similar position. He received the label warning from Sherwood and thus should certainly be considered as a "user" of the catheter. Ru-

---

5. Within the last several years an innovative theory of liability has been successfully maintained against manufacturers of drugs and medical devices. These manufacturers have been held liable to doctors for the economic and emotional injuries they suffered as a result of harm caused to their patients by the manufacturers' products. See, *e.g., Conlee v. McGhan Medical,* No. 81–4062 (Tex., Nuecas County District Court, Dec. 15, 1983) (Texas jury returned a $11.1 million award, including $10 million in punitive damages, against the manufacturer of inflatable breast prostheses, finding it liable for the mental anguish caused and income lost by a doctor who replaced forty-eight defective prostheses in his patients without charge); *Kennedy v. McKesson Co.,* 58 N.Y.2d 500, 448 N.E.2d 1332, 462 N.Y.S.2d 421 (1983) (dental surgeon recovers damages from the manufacturer and installer of an anesthesia machine for the pecuniary expenses to his reputation and practice he suffered when a patient died during minor surgery); *Oksenholt v. Lederle Laboratories,* 294 Or. 213, 656 P.2d 293 (1982) (physician could maintain an action for misrepresentation against the drug manufacturer; elements of recoverable damages included lost earning capacity, lost income caused by harm to the physician's reputation and punitive damages); *Runnels v. Astra Pharmaceutical Products, Inc.,* Nos. 218450 and 224532 (Cal., Sacramento County Superior Court, May 25, 1976) (plaintiff physician was entitled to damages for emotional distress and economic losses, including lost income and the settlement of the claim against him).

bush also fits into the Restatement's definition of "consumer" since he prepared and employed the catheter for ultimate "consumption" by Phelps. Even more significantly, he utilized the catheter for the purpose of surgery. This characterization of Rubush as "user" requires a discussion of his role as a "learned intermediary."

*Physician as Learned Intermediary.* Sherwood correctly contends that the intervention of a professional intermediary—here Rubush—affects its duty to warn of potential dangers of its catheter's use. Indiana courts have held that the "duty to warn of hazards associated with prescription drugs is part and parcel of the physician-patient relationship." *Ingram v. Hook's Drugs, Inc.*, 476 N.E.2d 881, 886 (Ind.App.1985). The duty of the drug manufacturers is initially to warn of risks by alerting the doctors who then use their training to determine whether to prescribe the drug. See, *e.g., Ullman v. Grant,* 114 Misc.2d 220, 450 N.Y.S.2d 955 (1982); see also *supra* at p. 301.

In *Chapman,* the prescription drug manufacturer discharged its duty to warn by warning a patient's physician. 388 N.E.2d 541. The physician then had the duty to inform himself of the drug's propensities before using it on his patients. This "learned intermediary" exception has equal application to those cases concerning medical devices. Phelps tries here to distinguish the Indiana law regarding prescription drugs from situations involving medical devices. Yet this Court can find no principled basis for such a distinction. Applying *Chapman* and *Ingram* to this field, it was up to Dr. Rubush, the heart surgeon who, according to the evidence, knew the risks and benefits of this kind of catheter usage, to warn Phelps.

In judging Phelps' challenge to the particular jury instruction that Rubush was the "user" or "consumer" of the catheter (quoted *supra,* p. 300), it must be determined whether the instructions overall conveyed the "correct message" to the jury. *Liquid Air Corp. v. Rogers,* 834 F.2d 1297 at 1308 (7th Cir.1987). This Court's review

reveals that the instruction given by the trial court comports with the general law of Indiana regarding both the duty to warn and the physician's role as a learned intermediary. Having concluded that Sherwood had no duty to warn users of the catheter other than Rubush, the operating surgeon, this Court may now consider Phelps' remaining claims, which merit a more summary treatment.

 1. Sherwood attempted to avail itself of the "open and obvious" defense. As a matter of law in Indiana, an open and obvious danger bars an action under the Product Liability Act, §§ 33–1–1.5–4, *et seq.* See *Ruther v. Robins Engineering and Constructors,* 802 F.2d 276, 278 (7th Cir. 1986). The Indiana Supreme Court has stated that "to impose liability upon manufacturers, the defect must be hidden and not normally observable, constituting a latent danger in the use of the product.... [The manufacturer] has no duty to warn if the danger is open and obvious." *Bemis,* 427 N.E.2d at 1061; see also *Posey v. Clark Equipment Co.,* 409 F.2d 560, 563 (7th Cir.1969). This is particularly true if the manufacturer has no reason to know of the use creating the specific hazard. *Gonzales v. Volvo,* 752 F.2d 295 (7th Cir.1985).

 The facts developed at trial showed that the suturing of Sherwood's catheter to a patient presented the danger of separation. In his deposition, Rubush testified that he knew of this potential hazard: specifically the suture of the catheter to Phelps' pulmonary vein and its routing could obstruct its removal. Phelps, however, contends otherwise, *viz.,* that the possible catheter breakage was not open and obvious.

While Sherwood would not be liable for obvious dangers associated with the risks of catheter use, it was bound to avoid any hidden defects or concealed dangers in its product. *Dudley Sports Co. v. Schmitt,* 151 Ind.App. 217, 279 N.E.2d 266, 274 (1972). The district court in this case gave an instruction which correctly stated this proposition of law. Phelps did not meet his requisite burden of proof in that he failed to present evidence during the trial that the

catheter contained a defect that was "hidden and not observable." See *Bishop*, 814 F.2d at 442 (quoting *Bemis*, 427 N.E.2d at 1061). Because a reasonable jury properly instructed in Indiana law could infer that the danger of catheter breakage due to attempted removal after suturing and routing to the heart cavity was both open and obvious, *Estrada v. Schmutz Manufacturing Co., Inc.*, 734 F.2d 1218, 1220 (7th Cir.1984), this Court holds that Sherwood did not have to warn Rubush of those dangers which he already knew.

2. An unforeseeable misuse of a product also bars an action under Indiana law. Such a defense to liability is contained in Indiana Code § 33-1-1.5-4. See *Ruther*, 802 F.2d at 279. Phelps objected to the district court's misuse instruction, alleging that the record contained no evidence that the catheter was not used properly. Sherwood responded that its catheter was designed for general and variable therapeutic purposes but not specifically for the kind of use to which Rubush put it in open-heart surgery. Rubush evaluated Phelps' condition and sutured the catheter in a manner not intended by Sherwood. Because there was sufficient evidence of misuse, this issue properly went to the jury. Moreover, the jury was instructed properly on the misuse defense.

3. Phelps was not required to prove that the alleged defect he attributes to Sherwood was the sole cause of his injury; it would be sufficient under Indiana law if the defect, combined with other reasonable or foreseeable intervening forces, constituted a proximate cause of his injuries. Modification of the catheter, however, if unforeseeable, could constitute an efficient intervening cause of Phelps' injuries. Under Indiana law, Phelps could prevail under strict products liability theory only if he could demonstrate that the allegedly defective product reached him "without substantial alteration in the condition in which it is sold" and that his injuries were caused as a result of the defective product. Ind.Code § 33-1-1.5-3 (1983 Supp.). The Indiana courts have held that "any change which increases the likelihood of a malfunc-

tion ... *is a substantial change.*" *Cornette v. Searjeant Metal Products, Inc.*, 147 Ind.App. 46, 258 N.E.2d 652, 657 (1970) (emphasis in original). See also *E.Z. Gas, Inc. v. Hydrocarbon Transportation, Inc.*, 471 N.E.2d 316 (Ind.App.1984); *Bishop*, 814 F.2d at 443.

Sherwood asserted that its catheter was substantially altered by being connected to Phelps' heart with a "purse-string" suture, and that this method and routing of the catheter increased the likelihood of a malfunction such as the separation of the catheter's tubing upon any attempted removal. If the particular modifications were foreseeable and did not unforeseeably render the catheter unsafe, the alterations would be a non-intervening cause leading to Phelps' injury. *Craven v. Niagara Machine and Tool Works*, 417 N.E.2d 1165, on rehearing, 425 N.E.2d 654 (Ind.App. 1981). Phelps asserts that the trial court should not have instructed the jury on intervening causes, but he had the burden of demonstrating that Rubush's use of sutures on the catheter and its routing did not increase the danger of separation. The evidence presented at trial, however, was uncontroverted that the catheter had undergone a substantial change from the time it left Sherwood's hands to the time of its separation. Since under Indiana law any change that increases the likelihood that a product will malfunction constitutes a "substantial change," this Court must hold that it was proper for the district court to instruct the jury on modifications of the catheter through Rubush's usage as an intervening cause which led to Phelps' subsequent unfortunate condition.

4. The jury was instructed on the "state of the art defense" provided in Indiana Code § 33-1-1.5-4(b)(4):

Whenever the physical harm is caused by the plan or design of the product, it is a defense that the methods, standards, or techniques of designing and manufacturing the product were prepared and applied in conformity with the generally recognized state of the art at the time the product was designed or manufactured.

Phelps claimed that Sherwood's catheter was defective in both design and manufacture. In arguing that the court erred in giving its charge, he relies on a statement by the Indiana Court of Appeals: "The fact that a particular product meets or exceeds the requirements of its industry is not conclusive proof that the product is necessarily safe." *Dudley Sports Co. v. Schmitt*, 151 Ind.App. 217, 279 N.E.2d 266, 271 (1972). This case, however, antedates the state statute enacted in 1978 which specifically provides for the defense at issue, and was therefore inappropriate precedent for consideration here. While other Indiana cases relied on in this opinion involved pre-1978 causes of action, they were not preempted by the 1978 statute at issue in this matter.

▪ 5. The subject matter of Phelps' remaining proposed instructions regarding negligence, "environmental use" of the product, and strict liability were adequately covered in the court's various jury charges. "It is not necessary to give a proposed instruction 'where the essential points are covered in another instruction.'" *Liquid Air Corp. v. Rogers*, 834 F.2d 1297 at 1309 (quoting *United States v. Hansen*, 701 F.2d 1215, 1218 (7th Cir.1983)). Under Indiana law, a manufacturer is charged with the duty to anticipate what the environment will be like in which the product is to be used and what the foreseeable risks of such use are. *Huff v. White Motor Corp.*, 565 F.2d 104 (7th Cir.1977); *Newton v. G.F. Goodman*, 519 F.Supp. 1301, 1306 (N.D.Ind.1981). The court here instructed that for liability of the manufacturer the catheter must be dangerous to an extent beyond that which would be anticipated or contemplated by the ordinary consumer with the ordinary knowledge of the purchasing community. The court also charged that a manufacturer is subject to liability for physical harm caused to a user if that user is in the class of persons that the seller should reasonably foresee as subject to the harm. Reviewing the proposed instructions tendered by Phelps, it is clear that the district court properly instructed on all phases of foreseeability in its jury charge on negligence.

▪ Finally, Phelps contends that the trial court did not properly instruct the jury on the failure to warn under strict products liability. In *Black v. Henry Pratt Co.*, 778 F.2d 1278 (7th Cir.1985), we explained that under Indiana law a manufacturer has a duty to warn of the dangerous condition of a product "only if [the product is] in fact defective and thus dangerous for the use for which [it] was supplied. '[There is no duty to warn] with respect to a product which is, as a matter of fact, not dangerous.'" *Id.* at 1283 (quoting *American Optical Co. v. Weidenhamer*, 457 N.E.2d 181, 187 (Ind.1983)). The Restatement (Second) of Torts provides that strict liability applies only where the product as sold is "dangerous to an extent beyond that which would be contemplated by the ordinary [person] who purchases it." Restatement (Second) of Torts § 402(A), comment i. In *Bemis*, 427 N.E.2d at 1061, the Indiana Supreme Court stated that "[a]lthough the manufacturer who has actual or constructive knowledge of an unobservable defect or danger is subject to liability for failure to warn of the danger, he has no duty to warn if the danger is open and obvious to all [*i.e.*, the ordinary user such as Rubush]." The court has also stated "'[t]here is no duty to warn just because a product might conceivably cause injury.'" *American Optical Co. v. Weidenhamer*, 457 N.E.2d 181, 187 (Ind.1983) (quoting 63 Am.Jur.2d 53, *Products Liability* § 42). In *Ragsdale v. K-Mart Corporation*, 468 N.E.2d 524, 527 (Ind.App.1984), the appellate court stated that "[w]hether a defect or danger is open and obvious is an objective test, based upon what the user should have known [or observed]."

Sherwood only had a duty to warn of those dangers which it knew or should have known at the time it distributed its catheter. Cf. *Woodill v. Parke, Davis & Co.*, 79 Ill.2d 26, 37 Ill.Dec. 304, 402 N.E.2d 194 (1980). The evidence presented at trial clearly established that the catheter, if properly routed and not sutured to an artery, was not dangerous. Phelps' proposed instructions on strict liability therefore need not have been given since Sherwood had placed a warning label on this item and

Rubush had already learned of possible mishaps due to his intended usage.

Phelps fails to demonstrate that the court erred in either giving Sherwood's or refusing his own tendered instructions. The court appropriately adhered to the principles of *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, by applying the state law as declared by either the Indiana Supreme Court or the intermediate appellate court. *Affiliated FM Ins. Co. v. Trane Co.,* 831 F.2d 153, 155 (7th Cir.1987). While the Indiana Supreme Court has not specifically passed on all the issues discussed in this opinion, there is no good reason to believe that the state's highest court would reject those decisions by the intermediate court, and consequently this Court may treat the Indiana Court of Appeals' decisions cited in this opinion as authoritatively stating the law of Indiana. See, *e.g., Tippecanoe Beverages,* 833 F.2d at 638–39.

AFFIRMED.